# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## NORTHERN DIVISION

KATHLEEN E. WALTON,                    )
                                       )
            Plaintiff,                 )
                                       )
      vs.                              )            Case No. 2:08CV56MLM
                                       )
MICHAEL J. ASTRUE,                     )
                                       )
            Defendant.                 )

## MEMORANDUM OPINION

This is an action under Title 42 U.S.C. § 405(g) for judicial review of the final decision of Michael J. Astrue ("Defendant") denying the applications for Disability Insurance Benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 et seq., and Supplemental Security Income ("SSI") under Title XVI of the Act, 42 U.S.C. §§ 1381 et seq., filed by Plaintiff Kathleen E. Walton ("Plaintiff"). Plaintiff filed a Brief in Support of the Complaint. Doc. 15. Defendant filed a Brief in Support of the Answer. Doc. 18. Plaintiff filed a Reply Brief. Doc. 19. The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c)(1). Doc. 8.

## I.
## PROCEDURAL HISTORY

Plaintiff filed an applications for Disability Insurance Benefits and SSI, alleging a disability onset date of August 1, 2004. Tr. 12, 60-67. On May 16, 2005, Plaintiff's applications were denied. Tr. 38-53. Plaintiff filed a timely request for hearing. Tr. 54-55. Hearings were held on February 26, 2007 and November 7, 2007, before an Administrative Law Judge ("ALJ"). Tr. 449-56, 469-519.

On February 8, 2008, the ALJ issued a decision finding that Plaintiff was not disabled. Tr. 9-23. On August 22, 2008, the Appeals Council denied Plaintiff's request for review. Tr. 5-7. Thus, the decision of the ALJ stands as the final decision of the Commissioner.

## II.
## MEDICAL RECORDS

Records from Northeast Missouri Family Medical Clinic, dated July 2, 2001, reflect Plaintiff had an abdominal x-ray; that Plaintiff was "very constipated"; and that the x-ray showed that Plaintiff had DJD at L 2/3. Tr. 199.

Records from Northeast Missouri Foot Clinic, dated July 9, 2001, state Plaintiff presented "with inflamed lesion 5th digit right foot. Duration of symptoms has been off and on for the past few weeks. Patient denies any treatment." Tr. 272-73. Records further reflect that Plaintiff's past medical history was "[p]ositive for diabetes, asthma, arthritis and heart disease; that Plaintiff had a hysterectomy; that Plaintiff's then-current medications were Avandia, Celebrex, and Glucotrol; that Plaintiff had no known drug allergies; and that Plaintiff was positive for tobacco use. Records state that the podiatric exam showed that "[n]eurolgic-intact, sharp, dull vibratory proprioception"; that an Integument-Grade I ulceration was noted to 5th digit of the right foot; that there were no signs of infection; that hyperkeratotic build up was present; that nails had clinical evidence of onychomycosis; and that nails were thick and discolored. Tr. 273. Deborah A. K. Holte, D.P.M., reported that Plaintiff had a diabetic ulcer, hammertoe, and onychomycosis; that the plan was to debride Plaintiff's nails; that shoe gear to accommodate Plaintiff was discussed; that surgical intervention for Plaintiff's hammertoes was recommended to prevent infection; and that Plaintiff was advised not to utilize over the counter corn remover medication. Tr. 273.

Records from Harry B. Young, Jr., D.O., F.O.C.O.O., dated October 9, 2001, reflect that Plaintiff presented "for open angle glaucoma" and that Plaintiff's diagnosis included open angle glaucoma, and diabetes. Tr. 281.

Dr. Young reported on November 19, 2001, that Plaintiff was diagnosed with "S/P ACT nasal 180° OS," nuclear cataract, diabetes mellitus, and open angle glaucoma and that Plaintiff was to see Dr. Young in January to schedule cataract surgery. Tr. 282.

Records from The Family Health Center, dated December 21, 2001, reflect that Plaintiff presented with back and arm pain; that Plaintiff was sixty-seven inches tall; that Plaintiff weighed 261 pounds; that Plaintiff's blood pressure was 132/78; that Plaintiff's eyes were "alert," "oriented," and in "no acute distress"; that Plaintiff's "gait and station [were] normal, no edema or palpable masses, no atrophy"; that Plaintiff's "joint [was] stable without evidence of dislocation or ligamentous laxity"; that Plaintiff's "cranial nerves 2-12 intact bilat"; that Plaintiff's "DTR's [were] normal, no sensory deficit or parasthesias"; that Plaintiff's skin had "good color and turgor, no masses or lesions"; that Plaintiff was experiencing upper back pain; that this pain had been worsening for weeks; that Plaintiff's pain went into her left shoulder; that Plaintiff was positive for joint pain and Type 2 diabetes; that it was recommended that Plaintiff have work restrictions for two weeks; and that Plaintiff's Vioxx dosage was increased. Tr. 299-300.

Records from Dr. Young, dated February 26, 2002, reflect that Plaintiff was diagnosed with "posterior subcapsular cataracts" and that the cataract surgery process was explained to Plaintiff. Tr. 283.

Records from Dr. Young, dated April 3, 2002, reflect that Plaintiff had cataract surgery. Tr. 285.

Records from Dr. Young, dated April 12, 2002, reflect that Plaintiff presented with eye pain. Tr. 287.

Records from Dr. Young, dated April 15 and 25, 2002, reflect that Plaintiff presented for re-evaluation following her cataract surgery. Tr. 288-89. Dr. Young's records of June 19, 2002, reflect that Plaintiff stated that she quit her job at a nursing home and that her insurance was still active. Tr. 292.

Records from Dr. Young, dated October 16, 2002, reflect that Plaintiff underwent "[p]hacoemulsification with aspiration-irrigation of cataract with the insertion of a posterior chamber ... without incident." Tr. 294.

Records from The Family Health Center, dated October 21, 2002, reflect that Plaintiff presented complaining of a "cough, congestion, [and] left ear pain." Records further reflect that Plaintiff's blood pressure was 140/72; that Plaintiff's heart rate was 88 BPM; that Plaintiff was positive for tobacco use; that Plaintiff had a history of glaucoma and cataracts; that Plaintiff had bilateral cataract removal six days prior; that examination revealed that Plaintiff's eyes were "alert," "oriented," and exhibited "no acute distress"; that Plaintiff exhibited mild congestion with clear drainage; that Plaintiff's heart had normal rate and rhythm, with no murmur or extra sounds; that Plaintiff had a normal respiratory effort, with no use of accessory muscles; that Plaintiff's lungs were clear to auscultation, with no wheezes, rales or rhonchi; that Plaintiff had no gastrointestinal masses or tenderness; and that Plaintiff was diagnosed with URI/sinusitis. Tr. 301-02.

Records from Dr. Young, dated October 22, 2002, reflect that Plaintiff presented for a one week follow-up appointment and that Plaintiff reported that she was "doing well." Tr. 295.

Records from Dr. Young, dated December 5, 2002, reflect that Plaintiff presented for an

appointment and that Plaintiff had not used her drops for approximately one week. Tr. 297.

Records from Northeast Missouri Health Council, Inc. ("NMHC"), dated August 25, 2003, reflect that Plaintiff presented to obtain the results of lab work. Records further reflect that Plaintiff weighed 258 pounds; that Plaintiff's blood pressure was 130/72; that Plaintiff's heart rate was 84 BPM, with a regular rhythm and no murmurs; that Plaintiff's lungs were clear; that Plaintiff's chest motion was good; that Plaintiff had no abdominal masses; that Plaintiff had epigastric tenderness; that Plaintiff's skin was normal; that Plaintiff's neurological exam was normal; and that Plaintiff's foot examination was normal. Beth Schrage, R.N.C., F.N.P., diagnosed Plaintiff with "NIDDM," Hyperlipidemia, and GERD. Nurse Schrage recommended that Plaintiff refill her prescriptions, schedule a gallbladder ultrasound, and take Prevacid. Tr. 160.

Records from NMHC, dated September 24, 2003, state that Plaintiff presented to NMHC "coughing" and with "sinus drainage." Tr. 161. Records further state that Plaintiff weighed 258 pounds; that Plaintiff's blood pressure was 122/72; that Plaintiff was experiencing bilateral wheezing; that Plaintiff had no edema to the extremities; and that Plaintiff was diagnosed with acute bronchitis. Tr. 161.

Records from The Family Health Center, dated December 15, 2003, reflect that Plaintiff presented with a "hurt lower back [and left] hip." Records further state that Plaintiff weighed 263 pounds; that Plaintiff's blood pressure was 132/84; that Plaintiff was taking Lipitor, Glucovance, Effexor, Darvocet, Tylenol, and ibuprofen; that Plaintiff had a past history of fibromyalgia and Type II Diabetes; and that Plaintiff's eyes were "alert," "oriented x 3" and exhibited "no acute distress." Tr. 303-04.

Records from The Family Health Center, dated January 23, 2004, reflect that Plaintiff

presented with "back pain"; that Plaintiff weighed 265 pounds; that Plaintiff's blood pressure was 140/76; that Plaintiff's had a history of back pain with a duration of "years"; that Plaintiff said she was in "constant pain"; Plaintiff reported that her sleep was poor due to pain; that Plaintiff was positive for tobacco use; that Plaintiff's eyes were "alert" and "oriented x 3" and exhibited "no acute distress"; that Plaintiff's "ROM [was] normal without pain, crepitation or contracture, strength 5/5 bilat"; that Plaintiff's "DTR's [were] normal, [with] no sensory deficit or parasthesias"; and that Plaintiff's diagnosis was "LBP/L iliolumbar ligament sprain." Tr. 305-06.

Records from NMHC reflect Plaintiff was to present on February 19, 2004, and that Plaintiff rescheduled. Tr. 162.

Records from the Family Health Center, dated February 23, 2004, reflect that Plaintiff presented with "congestion [and] low back pain"; that Plaintiff had a history of "chest congestion"; that Plaintiff's chest congestion was "persisting" and lasted approximately five days; that Plaintiff weighs 263 pounds; that Plaintiff's blood pressure was 150/80; that Plaintiff was positive for tobacco use; that Plaintiff was "alert" and "oriented x 3" and was in "no acute distress"; that Plaintiff's ear "canals [were] intact, tympanic membranes clear and intact bilat"; that Plaintiff's oropharynx displayed "no lesions, no erythema, teeth in good repair"; that Plaintiff's heart had a "regular rate and rhythm, no murmur or extra sounds"; that Plaintiff's "extremities reveal[ed] no evidence of edema and/or varicosities, pedal pulses equal bilat"; that Plaintiff exhibited a "normal respiratory effort, [with] no use of accessory muscles"; that Plaintiff's "lungs [were] clear to auscultation, [with] no wheezes, rales, or rhonchi, breath sounds x4"; that Plaintiff's diagnosis was sinusitis; and that Plaintiff was given a work release for the evening. Tr. 307-08.

Records from NMHC, dated March 1, 2004, reflect that Plaintiff presented to review her

medications; that Plaintiff was "not compliant with diet or exercise"; that Plaintiff weighed 270 pounds; that Plaintiff's blood pressure was 130/78; that Plaintiff's lungs were clear to auscultation; that Plaintiff's chest motion was good; that Plaintiff had no abdominal tenderness or abdominal masses; that Plaintiff had no organomegaly; that Plaintiff had no edema; and that it was recommended Plaintiff increase her dosage of Lipitor, review her diet and exercise habits, and return for further examination in two weeks. Tr. 163.

Records from NMHC, dated March 15, 2004, reflect that Plaintiff presented for a follow-up appointment; that Plaintiff weighed 270 pounds; and that Plaintiff's blood pressure was 140/80. Tr. 164.

Records from NMHC, dated March 29, 2004, state that Plaintiff reported "that she did not increase [L]ipitor; ha[d] not been watching her diet." Records further reflect that Plaintiff weighed 270 pounds; that Plaintiff's blood pressure was 128/80; that Plaintiff's heart rate was 164 BPM with a regular rhythm; that Plaintiff was alert with no distress; that Plaintiff's lungs were clear; that Plaintiff's chest motion was good; that Plaintiff was diagnosed with "NIDDM"; and that Plaintiff was instructed to increase her Lipitor dosage and was to have a lipid panel in thirty days. Tr. 165.

Records from the Northeast Missouri Family Health Clinic, dated March 29, 2004, reflect that Plaintiff's blood sugar was 240. Tr. 204.

Records from NMHC, dated April 28, 2004, reflect that Plaintiff presented with a "sneezing – cough – runny nose"; that Plaintiff also complained of "pain, nausea" and "heartburn"; that Plaintiff's blood pressure was 128/78; that Plaintiff's heart rate was 72 BPM with a regular rhythm; that Plaintiff's cardio-respiratory exam indicated a cough and shortness of breath; that Plaintiff an elevated blood sugar level of 214 the morning of the examination; that Plaintiff presented alert,

without distress; that Plaintiff's lungs were clear; that Plaintiff's chest motion was good; that Plaintiff had no abdominal tenderness; that Plaintiff had complained of leg cramps; and that Plaintiff was diagnosed with viral syndrome, "RUQ abd pain," fatigue, and myalgia. Tr. 166.    A note from Northeast Missouri Family Health Care, dated April 29, 2004, requests to "excuse [Plaintiff] due to illness." Tr. 168.

Laboratory records from Nemo Family Health Clinic, dated April 29, 2004, state that Plaintiff's "comprehensive metabolic panel" was "in range," with the exceptions that her glucose level was elevated and her carbon dioxide level was depressed. Tr. 205.

Records from NMHC, dated May 4, 2004, reflect that Plaintiff cancelled an appointment for that date. Tr. 167.

Records from NMHC, dated May 13, 2004, state Plaintiff "did not show" for an appointment. Tr. 169.

Records from NMHC, dated May 20, 2004, state that Plaintiff presented for "lab results and discussion"; that Plaintiff was alert with no distress; that Plaintiff's heart rate was 88 BPM, with a regular rhythm and no murmurs; that Plaintiff's blood pressure was 128/88; that Plaintiff's lungs were clear; that Plaintiff's chest motion was good; that Plaintiff had no abdominal masses and no abdominal tenderness; that Plaintiff did not have a hernia; that Plaintiff was diagnosed with "abdominal pain" and "NIDDM"; and that Plaintiff was to "follow up as needed." Tr. 170.  A "Return to Work Certificate" signed by Nurse Schrage, dated May 20, 2004, requests that Plaintiff's employer "excuse [her] for 2 days [ ] due to illness."  The certificate further states that Plaintiff could return to work on May 24, 2004. Tr. 171.

On June 8, 2004, Henry D. Petry, D.O., certified to the Northeast Missouri Community

Action Agency that Plaintiff was in need of an air conditioner due to her asthma. Tr. 172.

Records from NMHC, dated July 16, 2004, reflect that Plaintiff had an appointment for that date, which Plaintiff rescheduled. Tr. 173.

Office notes from Nurse Schrage, dated July 23, 2004, reflect that Plaintiff presented complaining of "back pain [and] feeling tired all of the time"; that Plaintiff's blood pressure was 146/98; that Plaintiff's lungs were clear; that Plaintiff's chest motion was good; that Plaintiff was diagnosed with "fatigue" and "elevated B/P"; and that Nurse Schrage recommended Plaintiff decrease her salt intake and increase diet compliance. Tr. 174.

A laboratory report, dated July 23, 2004, from Nemo Family Health Clinic states that Plaintiff's glucose, carbon dioxide, and albumin levels and the "absolute eosinophils" were outside the reference range. Tr. 206-207.

Records from NMHC, dated July 29, 2004, reflect that Plaintiff presented to talk about blood work and pain. Records further reflect that Plaintiff reported her "chest fe[lt] tight, very stressed, emotions seem[ed] out of control. Feels depressed, defensive." Notes of this date further state that Plaintiff complained of "generalized back and shoulder pain; some numbness on outer aspect of [illegible] leg – not always." Upon physical examination, it was reported that Plaintiff was alert without distress; that Plaintiff's heart rate was 64 BPM, with a regular rhythm and no murmurs; that Plaintiff's blood pressure was 152/82; that Plaintiff's lungs were clear; that Plaintiff's chest motion was good; and that Plaintiff was prescribed Ultracet and referred to social services for depression. Tr. 175.

Records from NMHC, dated August 9 and 30, 2004, reflect that Plaintiff cancelled her appointments scheduled for those dates. Tr. 176, 178.

Records from NMHC, dated September 1, 2004, reflect that Plaintiff presented with back pain and "back numbness in legs and fingers," notably in the right hand; that this pain and numbness had been "present 8-9 days"; that Plaintiff's weighed 265 pounds; that Plaintiff's blood pressure was 148/78; that Plaintiff's heart rate was 76 BPM, with no murmurs; that Plaintiff's lungs were clear and her chest motion good; that Plaintiff had no abdominal masses and no tenderness in her abdomen; that Plaintiff's right shoulder was tender; that Plaintiff's left sacroiliac was tender; and that at least one of Plaintiff's ribs was tender. Records of this date further reflect that Plaintiff was to receive physical therapy on her right shoulder, and that Plaintiff had "a Joint Injection of Left Sacroiliac Joint," performed by Henry D. Petry, D.O. Tr. 177.

Records from NMHC, dated September 8, 2004, state that Plaintiff presented for a follow-up hip examination; that Plaintiff complained of "[left] side pain in back, lots of pain"; that Plaintiff said she had "some improvement on right side, but back still hurts"; that Plaintiff weighed 264 pounds; that Plaintiff's blood pressure was 130/84; that Plaintiff's lungs were clear; that Plaintiff's chest motion was good; that Plaintiff had no masses in her abdomen, nor any tenderness in her abdomen; that Plaintiff's right sacroiliac area was "painful and swollen"; and that Plaintiff underwent "a Joint Injection of [the] Right Sacroiliac Joint." Tr. 180.

Records from NMHC, dated September 14, 2004, reflect that Plaintiff rescheduled her appointment. Tr. 182.

Records from NMHC, dated September 20, 2004, reflect that Plaintiff complained of "back discomfort" and said that she "need[ed] more meds" and that "[w]alking ma[de] her legs & feet go numb." Records further reflect that Plaintiff weighed 271 pounds; that Plaintiff's blood pressure was 130/82; that Plaintiff's "thoracic area [was] tender with muscle spasms"; and that Plaintiff's "sacral

area [was] tender with muscle spasms." Tr. 183.

Records from NMHC, dated September 29, 2004, reflect that Plaintiff presented for a follow-up appointment; that Plaintiff reported that her "lower back [was] still bothering [her]; that Plaintiff weighed 270 pounds; that Plaintiff's blood pressure was 124/80; that Plaintiff's lungs were clear; that Plaintiff's chest motion was good; and that Plaintiff's "CN 2-12" were "intact." Tr. 184.

Records from the NMHC, signed by Nurse Schrage, dated October 5, 2004, reflect that Plaintiff presented with "left ear pain, not feeling well" for "2-3 days," and that Plaintiff was diagnosed with otitis externa and bronchospasms. Tr. 186. A note signed by Nurse Schrage, dated October 5, 2004, states that Plaintiff "may not return to work on 10-6-2004" and to "excuse 10/4/04 due to illness." Tr. 185.

Records from NMHC, dated October 13, 2004, reflect that Plaintiff "did not show" for a scheduled appointment. Tr. 187.

Records from NMHC, dated October 19, 2004, reflect that Plaintiff presented with "back pain/discomfort – Requesting OMT" and that she "need[ed] med refills." Records further reflect that Plaintiff weighed 269 pounds; that Plaintiff's blood pressure was 138/88; that Plaintiff was not experiencing any tenderness in her abdomen and did not have any abdominal masses; that Plaintiff's "thoracic area [was] tender with muscle spasms"; and that Plaintiff's "sacroiliac [was] very tender." Tr. 189. Records from October 19, 2004, further reflect that Plaintiff had "a Joint Injection of Left Sacroiliac." Tr. 188.

Records from Quest Diagnostics, Inc., dated October 20, 2004, reflect that Plaintiff had an elevated triglycerides count, total cholesterol count, glucose level and hemoglobin count and that Plaintiff's counts were otherwise within the reference range.

Records from NMHC, dated November 1, 2004, reflect that Plaintiff cancelled a scheduled appointment. Tr. 190.

Records from NMHC, dated November 2, 2004, reflect that Plaintiff presented for a check-up and that she "complained of severe constipation [with] occas[ional] diarrhea – chronic situation." Records further reflect that Plaintiff weighed 265 pounds; that Plaintiff's blood pressure was 130/80; that Plaintiff presented alert and with no distress; that Plaintiff's lungs were clear; that Plaintiff's chest motion was good; that Plaintiff had no edema in her the extremities; that Plaintiff's diagnosis was "IBS – constipation"; and that it was recommended that Plaintiff "monitor diet more closely" and that Plaintiff "call [the] next week [with] blood sugars." Tr. 191.

Records from NMHC, dated November 15, 2004, reflect that Plaintiff presented for a follow-up regarding her blood sugar levels which were "trending [between] 180-220." Notes state that Plaintiff also presented with low back pain, thoracic pain, and IBS; that she weighed 265 pounds; that her blood pressure was 122/68; that her heart rate was 104, with no murmurs; that Plaintiff's lung auscultation was "CTAB"; that Plaintiff's chest motion was good; that Plaintiff's "thoracic area [was] very tender"; and that Plaintiff's "sacroiliac areas [were] tender with muscle spasms." Tr. 192.

Records from NMHC, dated December 13, 2004, reflect that Plaintiff failed to appear for a scheduled appointment. Tr. 193.

Records from NMHC, dated December 22, 2004, state that Plaintiff presented "want[ing] to talk about back, would like a flu shot, needs refill on Actos, sinus are bothering her, also needs refill on Zanoflex." Records further reflect that Plaintiff weighed 274 pounds; that Plaintiff's blood pressure was 136/82; that Plaintiff's heart rate was 88 BPM, with no murmurs; that Plaintiff's sinuses were non tender; and that Plaintiff's chest motion was good. Tr. 194.

Records from NMHC, dated January 12, 2005, reflect that Plaintiff reported that she experienced a "fall New Years day, 'everything hurts,' also hard to breath[e], cough, runny nose started yesterday." Records further reflect that Plaintiff weighed 264 pounds; that Plaintiff's blood pressure was 122/80; that Plaintiff was experiencing "maxillary and frontal tenderness" in the sinuses; and that Plaintiff's "sacroiliac [was] tender with muscle spasms." Tr. 195.

Records from NMHC, dated February 2, 2005, reflect that Plaintiff had an appointment for that date, which she rescheduled. Tr. 196.

Records from NMHC, dated February 4, 2005, reflect Plaintiff presented to "talk about back problem, needs to talk about getting food stamps." Records further state that Plaintiff weighed 264 pounds; that Plaintiff's blood pressure was 148/92; that Plaintiff's neck examination revealed no carotid bruits; that Plaintiff's lungs were clear; that Plaintiff's chest motion was good; that Plaintiff had no masses nor abdominal tenderness; that Plaintiff had no organomegaly; that Plaintiff had "tenderness low back 9/10 pain"; that Plaintiff's "hands go to sleep"; and that it was recommended that Plaintiff "apply for SSI disability - totally disable[d]." Tr. 197.

Records from NMHC, dated February 10, 2005, reflect Plaintiff presented because she "want[ed] to talk about releasing her from work, need[ed] med refills, want[ed] back TX." Records further reflect that Plaintiff weighed 266 pounds; that Plaintiff's blood pressure was 148/82; that Plaintiff's heart rate was 72 BPM; that Plaintiff had no abdominal masses or abdominal tenderness; that Plaintiff had no organomegaly; that Plaintiff was experiencing tenderness and muscle spasms in her thoracic area; that Plaintiff said that the pain in her low back was a nine on a scale of one-to-ten; that Plaintiff had no prefibial edema; and that Plaintiff's "feet go numb." Notes of this date also state

that Plaintiff was "unable to work at all now due to upper and lower back pain, numbness in feet."[1] Tr. 313.

A report from Quest Diagnostics, Inc., dated April 18, 2005, states that specimens collected from Plaintiff on April 15, 2005, show that Plaintiff had elevated triglycerides, total cholesterol levels, LDL-cholesterol, CHOL/HDLC ratio, microalbumin/creatinine, and glucose levels; that Plaintiff had a depressed carbon dioxide level; that Plaintiff had an out of range hemoglobin count; and that Plaintiff's testing levels were otherwise within the normal range. Tr. 343-44.

Records from NMHC, dated April 21, 2005, reflect that Plaintiff presented for lab results; that she was "concerned that she [could] not afford any of her med[ications]"; and that Plaintiff "[h]as disability / McD physical today." Records further reflect that Plaintiff "declined" to give her weight; that Plaintiff's blood pressure was 128/82; that Plaintiff presented alert and with no distress; that Plaintiff's lungs were clear; that Plaintiff's chest motion was good; that Plaintiff's neurologic exam was "intact"; and that Plaintiff's extremities showed no edema. Notes further state that Plaintiff's medications included C-peptide insulin and Lipitor. Tr. 314.

On April 21, 2005, Plaintiff was examined by John R. Sparks, D.O., who issued a Disability Determination Report. Dr. Sparks reported that examination showed that Plaintiff was well-developed; that she was alert and cooperative; that she was in no acute distress; that she was able to move about the office without difficulty; that Plaintiff's lungs were clear to auscultation; that her abdomen was obese with no masses or tremor; that Plaintiff's deep tendon reflexes and grip strength were normal; that, in regard to Plaintiff's complaint of pain in the upper thoracic area across the

---

[1] Plaintiff states that it was Dr. Petry's opinion on this date that Plaintiff could not work at all.

shoulders and pain in the lumbar area, Plaintiff had no muscular spasm in the paravertebral musculature of the lumbar area; and that Plaintiff had "very little" range of motion restriction. In the Report, Dr. Sparks stated, "[w]ith this examination, I find that the only real hindrance to this patient performing work-related functions would be her uncontrolled diabetes mellitus. The remaining exam shows the patient's complaints to exceed the physical findings." Dr. Sparks's impressions included: type 2 diabetes mellitus, uncontrolled, hyperlipidemia, per history, Fibromyalgia, per history, carpal tunnel syndrome, per history, and thoracic and lumbar strain. Tr. 216.

An April 22, 2005 report from Quest Diagnostics, Inc., from specimens collected on April 21, 2005, states that Plaintiff had an elevated C-Peptide level and that Plaintiff's insulin level was within rage. Tr. 345-46.

On May 6, 2005, Plaintiff was seen by James L. Tichenor, Ph.D., to whom the Section of Disability Determinations referred Plaintiff "for a consultation evaluation with report." After interviewing Plaintiff, Dr. Tichenor concluded,

> Ms. Walton presented as [a] distressed and depressed individual who appears to be in very poor physical health which has impacted her psychological condition. She [is] unable to complete a questionnaire because she could not see well enough to complete it. Her ability to understand and remember instructions and to concentrate and to persist with tasks appears to be impaired at this time. Her ability to interact socially and adapt appears to be lowered but not precluded. She does appear capable of managing money. Counseling support to help her manage her physical ailments is recommended.

Tr. 211.

Dr. Tichenor's Diagnostic Impressions included a finding at Axis I, of "Adjustment Disorder with mixed anxiety and depression, at Axis IV, "Unemployment, inadequate finances, inadequate

health care," and at Axis V, a GAF of 55.[2] Tr. 212.

Records from NMHC, dated May 12, 2005, state that Plaintiff presented with pain in her back, neck, and shoulder; that Plaintiff reported that she could "hardly lift [her] arm" and that she had cramps in her leg; that Plaintiff weighed 267 pounds; that Plaintiff's blood pressure was 120/82; that Plaintiff's lungs were clear; that Plaintiff's chest motion was good; that Plaintiff's "sacral area [is] tender with muscle spasms"; that both of Plaintiff's shoulders were tender; and that, upon full flexion, Plaintiff experienced a loss of pulse to the left arm. Tr. 315.

On May 15, 2005, Paul Stuve, Ph.D., Licensed Psychologist, completed a Psychiatric Review Technique Form and reported that Plaintiff had "Affective Disorders and Anxiety-Related Disorders"; that Plaintiff had mild limitations, in regard to Restriction of Activities of Daily Living; that, in regard to Difficulties in Maintaining Social Functioning, Plaintiff had moderate limitations; that, in regard to Maintaining Concentration, Persistence, or Pace, Plaintiff had moderate limitations; and that Plaintiff had no "Repeated Episodes of Decompensation, Each of Extended Duration." Tr. 219-32. Dr. Stuve also reported that there was no "MSS from a treating source regarding mental problems"; and that records reflected that Plaintiff's ability to socially interact and adapt were lowered "but not precluded." Dr. Stuve also stated that:

---

[2]     Global assessment of functioning ("GAF") is the clinician's judgment of the individual's overall level of functioning, not including impairments due to physical or environmental limitations.  See Diagnostic and Statistical Manual of Mental Disorders, DSM-IV, 30-32 (4th ed. 1994). Expressed in terms of degree of severity of symptoms or functional impairment, GAF scores of 31 to 40 represent "some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood," 41 to 50 represents "serious," scores of 51 to 60 represent "moderate," scores of 61 to 70 represent "mild,"  and scores of 90 or higher represent absent or minimal symptoms of impairment.  Id. at 32.

In her Claimant Questionnaire the claimant alleges physical problems and pain, as well as difficulty concentrating. She completes self-care tasks, prepares simple meals, does light household chores, and shops. Pain interferes with these activities to a degree. She manages money adequately. She can relate adequately to others, but is socially withdrawn. She needs to reread directions. The allegations are generally consistent with the MER and are considered credible.

Tr. 231.

In a "Mental Residual Functional Capacity Assessment," dated May 15, 2005, Dr. Stuve

stated:

The evidence in the file indicates that the claimant can understand and remember simple directions. Her concentration and persistence are moderately limited. She will have moderate difficulty related to the general public. She can interact adequately with coworkers and supervisors. She will have moderate difficulty adapting to changes in the workplace.

Tr. 233-35.

Records from NMHC, dated May 20, 2005, reflect that Plaintiff presented for "blood work and allergy pills." Notes also state that Plaintiff weighed 266 pounds; that Plaintiff's blood pressure was 121/76; that Plaintiff's heart rate was 88 BPM; that Plaintiff presented alert and with no distress; that Plaintiff's ear's were "dull"; that Plaintiff's nose was "swollen/pale"; that Plaintiff's throat was "pink"; that Plaintiff's lungs were clear; and that Plaintiff's chest motion was good. Tr. 316.

A June 2, 2005 note, signed by Nurse Schrage, certified to the Northeast Missouri Community Action Agency that Plaintiff "[was] in need of a fan, air conditioner, or Cooling Assistance because of the following medical condition or disability: diabetes, hypertension." Tr. 317.

Records from NMHC, dated June 27, 2005, state that Plaintiff presented "to talk [with] Beth [Nurse Schrage] about med[ications]." Records further state that Plaintiff weighed 262 pounds; that Plaintiff's blood pressure was 128/78; that Plaintiff's heart rate was 68 BPM; that Plaintiff was alert

and in no distress; that Plaintiff's lungs were clear; that Plaintiff's chest motion was good; that Plaintiff had no edema; that Plaintiff complained of foot pain; that Plaintiff's diagnosis included "IDDM" and Hyperlipidemia; that Plaintiff's medications included Lipitor and Effexor; and that Plaintiff was scheduled for diabetic education and insulin administration education. Tr. 318.

Records from NMHC, dated July 20 and 22, 2005, state that Plaintiff canceled appointments for those dates. Tr. 319-20.

Records from NMHC, dated July 28, 2005, reflect that Plaintiff presented for "more insulin, Actos, allergy meds – check on insulin." Notes also state that Plaintiff presented with a tender left shoulder; that Plaintiff weighed 264 pounds; that Plaintiff's blood pressure was 150/87; that Plaintiff's heart rate was 80 BMP; that Plaintiff's nose and throat were both pale; that Plaintiff had no sinus tenderness; that Plaintiff's lungs were clear; that Plaintiff's chest motion was good; that Plaintiff had no abdominal masses, abdominal tenderness, organomegaly, or prefibial edema; and that Plaintiff was prescribed Allegra and Actos. Tr. 321.

A July 29, 2005 report from Quest Diagnostics, Inc., for specimens collected on July 28, 2005, states that Plaintiff's creatinine, glucose, and hemoglobin levels were out of range, and that test results were otherwise within range. Tr. 347-48.

Records from NMHC, dated August 12, 2005, reflect Plaintiff presented for "med check & lab work results, low back & [illegible] are very painful, feet hurt!" Notes of this date also state that Plaintiff was "turned down on disability – says she cannot work." Records further state that Plaintiff weighed 263 pounds; that Plaintiff's blood pressure was 140/85; that Plaintiff's lungs were clear; that Plaintiff's chest motion was good; that Plaintiff's ears, nose, and throat were clear; that Plaintiff had no organomegaly; that Plaintiff had some hemorrhaging in the eyes (diabetic retinopathy); that

Plaintiff had no masses, nor any tenderness in the abdomen; and that Plaintiff had no prefibial edema. The treating healthcare professional noted that Plaintiff "is totally disabled for gainful employment due to physical status and education (11 grade) NO GED." Tr. 240.

Dr. Petry reported on August 12, 2005, that Plaintiff had a decreased range of motion of her lumbar spine; that Plaintiff had normal range of motion in both shoulders, with the exception of the internal rotation of both shoulders; that Plaintiff had normal range of motion in the cervical spine, in both elbows, in both forearms, in both wrists, and in both legs for straight leg raising; that Plaintiff had pain on the left side of the cervical spine upon examination; and that Plaintiff's grip was "strong" in the right hand and "moderate" in the left hand. Tr. 238, 322.

Records dated August 23, 2005, reflect that Jeffrey Harden, D.O., conducted a psychiatric evaluation of Plaintiff. Tr. 274-76. Dr. Harden's diagnostic impressions were as follows:

> Axis I: ADHD, Combined Type of Adulthood; Axis II: No Diagnosis; Axis III: Fibromyalgia, Hyperlipidemia, Insulin Dependent Diabetes Mellitus, Gastroesophageal Reflux Disease, Environmental Allergies, Rule Out Sleep Apnea (Patient complaints of snoring, awakening unrested and being tired throughout the day); Axis IV: Difficulty with Access to Health Care and Difficulty Sustaining Employment; and Axis V: Global Assessment for Functioning: Highest for the past year is assessed at a level 50. Global assessment of functioning at time of this evaluation was assessed at a level of 50.

Tr. 276.

Further August 23, 2005 records reflect that Dr. Harden recommended that Plaintiff "be evaluated for the possible presence of sleep apnea and that she pursue treatment medically for her ADHD." Tr. 276.

Records from NMHC, dated September 9 and 16, 2005, reflect that Plaintiff failed to appear for appointments scheduled on those dates. Tr. 239, 242.

Records from NMHC, dated September 23, 2005, state that Plaintiff presented because she "need[ed] Allegra. Tired all the time – not sleeping. [Lower] back hurting. No energy." Records further state that Plaintiff's blood pressure was 120/82; that Plaintiff weighed 267 pounds; that Plaintiff's heart rate was 80 BPM; that Plaintiff's lungs were clear; that Plaintiff's chest motion was good; that Plaintiff's abdomen exhibited no masses, nor any tenderness; that Plaintiff had no organomegaly; that Plaintiff experienced low back pain; that Plaintiff had no edema to the extremities; and that it was recommended that Plaintiff return for a follow-up appointment in two weeks. Tr. 241.

A September 24, 2005 report from Quest Diagnostics, Inc., from specimens collected on September 23, 2005, states that Plaintiff had an elevated glucose and hemoglobin A1c levels. The results of Plaintiff's comprehensive metabolic panel were otherwise normal. Tr. 243.

Records from NMHC, dated October 5, 2005, reflect that Plaintiff presented "need[ing] Actos, Lipitor, headache, head / [left] eye worse . . .[complaining of] eye pain w/ nausea that is worse with light and better in the dark." Notes further state that Plaintiff had a past medical history of glaucoma and cataracts and that Plaintiff's past surgical history revealed Plaintiff has had cataract surgery twice and two glaucoma surgeries. Records of this date also state that physical examination showed that Plaintiff weighed 274 pounds; that Plaintiff's blood pressure was 130/78; that Plaintiff's heart rate was 80 BPM; and that Plaintiff had no prefibial edema. Tr. 244.

Records from NMHC, dated October 28 and November 2, 2005, reflect that Plaintiff rescheduled appointments she had for these dates. Tr. 245-46.

Records from NMHC, dated November 18, 2005, reflect that Plaintiff presented "want[ing] flu shot & pneumonia – talk about social security advocate? Needs to see neurologist." Records further reflect that Plaintiff weighed 276 pounds; that Plaintiff's blood pressure was 150/83; that

Plaintiff's "lumbosacral area [was] tender"; that Plaintiff was diagnosed with "low back pain, [illegible], rotator cuff tendinitis"; and that it was recommended that Plaintiff have an MRI of the "lumbo-lumbosacral" and that she schedule an appointment with a neurologist. Tr. 247.

Records from New Concepts Open MRI, dated December 5, 2005, state that Plaintiff had a lumbar MRI without IV contrast and that the test showed that "[t]here [were] four lumbar-appearing vertebrae, with no significant finding of alignment, height or signal – and the distal spinal cord ha[d] no significant finding"; that the "L5 vertebra [was] very sacralized, appearing like an S1 vertebra"; that this "probably [was] not clinically significant"; that, at L5-S1 and L4-5, there was moderate facet osteoarthritis; that, at L3-4, there was moderate facet osteoarthritis and disk degeneration; that at L4-5, the loss of disk height was mild and there was a very small right-paracentral herniation; that, at L3-4 and L2-3, there was a "subtle anterior annulus fissure, but no bulging, herniation, or loss of disk height"; that "[a]s a result of the above, L3-4 central canal [was] relatively narrowed, but not to the point of (absolute) spinal stenosis"; that the remaining central canal calibers were normal; that "[t]he remainder of the lumbar spine ha[d] negative findings"; that the sacroiliac joints had mild arthritic change; that the sacrum had negative findings other than arthritic change, "with no evidence of trauma related to the fall that [Plaintiff] had"; that the cause of the numbness of the thighs and feet of which Plaintiff complained was "not apparent on the examination"; and that findings were "negative for the hip joints/bursae, musculature, and remaining findings (noting prior hysterectomy)." Tr. 248

Records, dated January 4, 2006, from the University of Missouri Health Care reflect that Plaintiff was seen by Shahzad Khan, MD, of the Neurology Department, for an evaluation of numbness/peripheral neuropathy. Dr. Khan recorded Plaintiff's history as follows:

This is a 50-year-old poor historian female who came in for evaluation of above symptoms. She has been having intermittent numbness and tingling in her feet which began about five or six years ago. She has more symptoms in her left as compared to her right lower extremity. She also has some cramps in the evening or nighttimes. Sometimes she wakes up in the middle of the night and has to move her leg. She felt some weakness of her legs, especially during walking. She noticed worsening of her symptoms after walking. She had intermittent numbness and tingling of her hands of unclear duration.

She has a history of low back pain for the last two-to-five years which began without any preceding trauma. She has constant burning type of pain which radiates down to both lower extremities. Nothing makes it better, but she notices worsening with physical activity or walking. In the past, she had received an **epidural spinal** injection without any improvement in her symptoms. She also used Darvocet and ibuprofen. She never had physical therapy and is not inclined to go for physical therapy either as she believes this will make her symptoms worse.

She has a history of snoring at nighttime for several years. She also reports having an episode of gasping for air, excessive daytime sleepiness, and excessive daytime fatigue. She has gained about 70 pounds of weight in the last one to two years, and her today [illegible] scale score was 18 out of 24.

She has a history of memory disturbance for the last several years. She denies any fever, chest pain, nausea, vomiting, passing out spells, seizure, hallucinations. All other systems were reviewed and found to be negative.

She has a history of depression, hyperlipidemia, COPD, severe infection, hysterectomy, cataract surgery and laser surgery for glaucoma. She has diabetes for the last ten years, which is poorly controlled.

Tr. 253-54 (emphasis in original).

Dr. Khan also noted in the January 4, 2006 report that Plaintiff quit smoking several years prior; that she had been unemployed for about one year; that Plaintiff's medications included Effexor, insulin, Albuteral, Advair, Nexium and Allegra; that Plaintiff was cooperative, oriented, and in no acute distress; that Plaintiff was "afibrile"; that Plaintiff had "good carotid pulsation without any carotid bruits"; that Plaintiff's heart sounds were normal; that Plaintiff's extremities did not reveal evidence of edema; and that her peripheral pulses were within normal limits. With regard to

22

Plaintiff's neurological examination, Dr. Khan reported that:

> The patient was awake, alert and oriented. The attention span and concentration was normal. The patient had adequate fund of knowledge and able to give details of recent medical history. Her immediate recall was one out of three. The patient had good spontaneous speech without any evidence of aphasia.
>
> The pupils round and reacting to light, extraocular movements were intact without any nystagmus. Patient has normal visual fields by confrontation and clear disc margin without disc edema. The patient had normal facial sensations, strength of facial muscles, movements of tongue and palates. The Patient has normal hearing by finger rub and normal shoulder shrug.
>
> She has minimal wasting of her distal feet muscle. The patient had normal tone and strength in all four extremities according to age and habitus. There was no pronator drift or involuntary movement. The muscle stretch reflexes were bilateral and symmetrical. They were +2/4 in upper and +2/4 in lower extremities. Planters were down going bilaterally.
>
> She has decreased vibratory sensation distally. She has abnormal sensation distally to pinprick at her feet. The finger to nose and rapid alternate movements were within normal limits. Gait and station [ ] was within normal limits.

Tr. 255.

Dr. Khan further reported on January 4, 2006, that Plaintiff had a comprehensive metabolic panel in July 2005, which was unremarkable; that her hemoglobin A1C in September 2005 was 8.4; that Plaintiff had an MRI of the lumbar spine in December 2005, which did not reveal any significant disc herniation or spinal stenosis; that the MRI "just show[ed] arthritic changes"; and that Plaintiff's history of abnormal sensation involving her extremities could be "consistent with diagnosis of peripheral neuropathy that can be due to diabetes." Dr. Khan's plan included "obtain[ing] a CT scan of the head, sleep study, nerve conduction study of her extremities, as well as multiple labs for further evaluation of [Plaintiff's] symptoms," starting Plaintiff on Neurontin, and having Plaintiff return to the clinic after she had tests. Tr. 255.

Records from NMHC, dated February 10, 2006, reflect that Plaintiff presented needing refills of medications; that Plaintiff reported that her voice had been coming and going for about a month after she was at a friends house where disinfectant had been sprayed; that Plaintiff weighed 273 pounds; that Plaintiff's blood pressure was 136/80; that Plaintiff was diagnosed with diabetes mellitus, COPD, obesity, and osteoarthritis; and that it was recommended that Plaintiff have smoking education and laboratory testing, including "HgBAK, lipid profile, CMP." Tr. 249, 323.

A February 11, 2006 report from Quest Diagnostics, Inc., for specimens collected on February 10, 2006, states that Plaintiff's lipid panel revealed elevated levels of triglycerides, total cholesterol, LDL-cholesterol, and CHOL/HDLC ratio; that Plaintiff's HDL cholesterol was within the reference range; that Plaintiff's glucose level and hemoglobin count were also elevated above the reference range; that Plaintiff's sodium level was below the reference range; and that test results were otherwise within reference ranges. Tr. 251.

Records from Dr. Khan, dated March 3, 2006, reflect that Plaintiff was evaluated for peripheral neuropathy and that a nerve conduction study showed that Plaintiff's "[l]eft peroneal and right tibial motor studies were abnormal"; that Plaintiff's "[b]ilateral sural sensory studies were abnormal"; that a concentric needle EMG examination "was within normal limits"; that Plaintiff had an abnormal electrophysiological study; that the findings of the study were consistent with diagnosis of sensory motor peripheral polyneuropathy; and that, given Plaintiff's history of diabetes, it could be the possible etiology in Plaintiff's case. Tr. 260. A CT scan of Plaintiff's head conducted on this same date showed no evidence of intracranial hemorrhage and mild prominence of the bifrontal extra-axial spaces and sulci, which could be "due to atrophy and less likely subdural hygroma." Tr. 263.

Dr. Khan reported on March 16, 2006, that Plaintiff had been diagnosed with peripheral

neuropathy likely due to diabetes; that Plaintiff did not notice a significant change in her symptoms while on medicine; that due to Plaintiff's history of excessive daytime sleepiness, Dr. Khan requested that Plaintiff have a sleep study; that "unfortunately she did not keep the appointment"; that Plaintiff planned to have the sleep study performed "sometime in June 2006 due to her family concerns"; that Plaintiff continued to have memory disturbance "but denie[d] any worsening of her memory disturbance since last seen in [Dr. Khan's] clinic"; that Plaintiff was "a pleasant, well built lady without any acute distress"; that Plaintiff was alert and had good orientation; that her speech was fluent and pupils were round and reactive; that she had good extraocular movement; that Plaintiff's motor examination showed normal tone and good motor strength; that Plaintiff had decreased sensation distally to pinprick and light touch; that her muscle stretch reflexes were "+2 all over"; and that she had normal coordination and unremarkable gait. Dr. Khan further reported Plaintiff's CT scan of the head showed evidence of atrophy and no history of intracranial hemorrhage and that Plaintiff's lab results showed that "[h]er ANA panel was negative, although her FANA titer was positive at 1:160"; that she had normal vitamin B12 and TSH; that Plaintiff's "comprehensive metabolic panel was unremarkable except it show[ed] elevated glucose and low albumin"; that Plaintiff had normal white cell, hemoglobin and platelet counts; and that Dr. Khan's impression included "[p]eripheral polyneuropathy, likely diabetic in nature," "[h]istory of snoring and daytime sleepiness which can be due to obstructive sleep apnea," "[m]emory disturbances," and fourth, "[a]bnormal FANA titers." Dr. Khan reported that Plaintiff's treatment plan included continuing gabapentin; that Plaintiff have the sleep study; and that Plaintiff have a neuropsychology evaluation and EEG for her memory disturbance. Dr. Khan further reported that Plaintiff requested a pain management evaluation for low back pain and ENT evaluation for hearing loss; that Plaintiff should

return after she has tests; that Plaintiff was advised to take a baby aspirin a day; and that Plaintiff's "abnormal FANA cab [should] be further investigated by her PCP, if clinically indicated." Tr. 267-69.

Records from NMHC, dated March 28, 2006, reflect that Plaintiff rescheduled an appointment scheduled for that date. Tr. 324.

Records from NMHC, dated May 19, 2006, state that Plaintiff presented with "pain in both arms and shoulder and back pain, [left] foot pain on side of foot"; that Plaintiff reported that her "blood sugar has been running high"; that Plaintiff weighed 265 pounds; that Plaintiff's blood pressure was 146/82; that Plaintiff's heart rate was 80 BPM, with a regular rhythm and no murmurs; that Plaintiff was positive for parasthesia and numbness from the waist down and in the her hands and arms; that Plaintiff has a history of irritable bowel syndrome; that Plaintiff's lungs were "clear" and "distant"; that Plaintiff's chest motion was good; that a neurologic exam showed that Plaintiff was 5/5 for strength and that Plaintiff had decreased sensation "B/L LE"; that Plaintiff's extremities exhibited no edema and were positive for pain with palpitation; that Plaintiff was experiencing pain in her left foot with inversion; and that Plaintiff's diagnoses included low back pain, "DMII," HTN, and diabetic neuropathy. Tr. 325.

Records from NMHC, dated May 26 and May 30, 2006, reflect that Plaintiff rescheduled appointments she had for these dates. Tr. 326-27.

Records from NMHC, dated June 16, 2006, reflect that Plaintiff presented because her "legs were retaining fluid" and "[h]urt – better now"; that Plaintiff weighed 271 pounds; that Plaintiff's blood pressure was 143/83; that Plaintiff's heart rate was 80 BPM, with regular rhythm and no murmurs; that Plaintiff had headaches and shoulder pain; that Plaintiff's lungs were clear; and that Plaintiff's diagnoses included pedal edema, right shoulder tendinitis, and DMII. Tr. 328.

Records from NMHC, dated June 16, 2006, reflect that Plaintiff was "no show for MMSE." Tr. 329.

Records from NMHC, dated June 28, 2006, reflect that Plaintiff reported that her "allergies are acting up"; that she had "leg cramps off and on"; that she was "sleep[ing] poorly"; and that she was "irritable, exhausted, forgets, [has] trouble concentrating, and [has] loss of interest." Records further reflect that Plaintiff weighed 268 pounds; that Plaintiff's blood pressure was 123/85; that Plaintiff had no headache; that Plaintiff's lugs were clear; that Plaintiff's chest motion was good; that Plaintiff's "lumbosacral area very [was] tender and swollen"; that Plaintiff's extremities showed no edema; that Plaintiff's diagnosis included "fatigue, diabetes mellitus, allergic [illegible], [and] unipolar depression"; and that it was recommended that Plaintiff have a psychological evaluation. Tr. 330.

Records reflect that, on June 28, 2006, Plaintiff had a Mini-Mental State Examination (MMSE), the report of which was signed by Dr. Petry. Test results showed that out of a possible score of 30, Plaintiff scored 27; that Plaintiff lost two points in the "Attention and Calculation" section and one point in the "Language" section; and that Plaintiff had a "mild" cognitive impairment, as defined by an MMSE score of above or equal to 21. Tr. 331.

Records from NHMC, dated July 7, 2006, reflect that Plaintiff reported that she had felt dizzy, could not walk the prior Friday, and had difficulty speaking; that Plaintiff weighed 268 pounds; that Plaintiff's blood pressure was 127/80; that Plaintiff was diagnosed with Transient Ischemic Attack ("TIA") and Diabetes; and that is was recommended that Plaintiff have a CT scan of the brain and return for a follow-up appointment after the CT scan. Tr. 332.

Records from Northeast Regional Medical Center, dated July 18, 2006, state that Plaintiff presented for a "CT head brain WW" examination and that the CT scan showed that "[t]he cerebral

hemispheres and basal ganglia region [were] unremarkable"; that the cortical sulcal spaces, ventricular system and basal cisterns were normal; that there was no mass effect, midline shift or extraaxial fluid collection; that calcification was seen in the fax in the midline anteriorly; that the posterior fossa structures [were] unremarkable"; and that the radiologist's impression was that "[t]here [was] no midline shift, hemorrhage or extraaxial fluid collection." Tr. 349-50, 377-79.

Records from NMHC, dated July 28, 2006, reflect that Plaintiff needed more blood pressure medicine; that Plaintiff reported that she "want[ed] to sleep all of the time for the last couple of weeks"; that Plaintiff weighed 270 pounds; that Plaintiff's blood pressure was 129/81; that Plaintiff was obese; that Plaintiff was experiencing constipation; that Plaintiff had non-pitting mild edema; and that Plaintiff was diagnosed with HTN, Diabetes Mellitus, type II, and GERD. Tr. 333.

Notes from NMHC, dated August 25, 2006, reflect that Plaintiff reported that she had back pain; that she had constipation; that she needed insulin needles; and that she was not sleeping well. Records further state that Plaintiff weighed 276 pounds; that her blood pressure was 142/77; that Plaintiff had "+1 pretibial edema"; that Plaintiff alleged insomnia; that she "never had a sleep study"; that Plaintiff was diagnosed with constipation, insomnia, and low back pain; and that it was recommended, among other things, that Plaintiff take colase and have a sleep study. Tr. 334.

Records from Northeast Regional Medical Center, dated August 31, 2006, reflect that Plaintiff presented with a knee injury/pain; that Plaintiff was diagnosed with an acute contusion of the left knee, acute pain in the left knee, and acute foot pain with strain; that the course of therapy was a "left long-leg knee immobilizer"; and that Plaintiff was to see Dr. Petry for follow-up. Tr. 388. An x-ray report of this date states that "[t]hree views of the left knee [did] not demonstrate a definite site of acute fracture or dislocation"; that there was "[m]inimal degenerative change"; that the joint

compartments were maintained; that discrete osseous pathological lesion was not apparent; and that the cortical margins were smooth. The x-ray report also stated that "[m]ultiple views of the toes of the left foot [did] not demonstrate a definite site of fracture or dislocation." The radiologist's impression was that Plaintiff had degenerative changes of the left knee and that acute fracture, dislocation, or pathologic lesion of the left knee or toes of the left foot were not apparent. Tr. 391.

Records from NMHC, dated November 6, 2006, reflect that Plaintiff stated that she had pain from the fall which she had the prior month; that she could not tolerate the pain; and that she fell because of dizziness episodes. Tr. 335.

Records from NMHC reflect that Plaintiff presented on December 12, 2006, for a follow-up; that Plaintiff requested an appointment with an orthopedic physician; and that Plaintiff reported that her dizziness had improved with Antivert. Tr. 336.

Records from NMHC reflect that, on January 15, 2007, Plaintiff requested a letter stating why she was "disabled and not able to work." Tr. 337.

Nurse Schrage, of Northeast Missouri Family Health Clinic, prepared a letter, in collaboration with Dr. John Knudsen, providing current healthcare information for Plaintiff's Medicaid review. Tr. 270, 309. The letter, dated January 17, 2007, states as follows:

> Mrs. Walton is a 51-year-old white female with multiple health concerns. Her current diagnoses include: Obesity, Hypertension, Hyperlipidemia, Type II Insulin Dependent Diabetes Mellitus, Peripheral Diabetic Neuropathy, Gastroesophageal Reflux, COPD/Asthma, Chronic Allergic Rhinitis, Fibromyalgia, Degenerative Joint Disease, Degenerative Disc Disease, Irritable Bowel Syndrome, Chronic Back Pain, Unipolar Depression/Dysthymia, Recurrent Tendinitis (Right shoulder), Glaucoma, ADHD, Probable Sleep Apnea, and History of TIA.
>
> Her current medications include Advair 100/50 1 puff twice daily; Allegra 180 mg 1 tablet daily; Albuteral Inhaler 2 puffs every 4-6 hours as needed; Antivert 25 mg 1 tablet every 8 hours as needed for dizziness; Effexor 225 mg 1 capsule daily;

Gabapentin 600 mg 1 tablet 3 times daily; Lantus 60 units daily at 7 p.m.; Lisinopril 40 mg 1 tablet daily; Metformin 500 mg 1 tablet twice daily; Ranatidine 300 mg 1 tablet twice daily; Vytorin 10/40 1 tablet daily.

Tr. 270, 309.

The letter further stated that Plaintiff had "a pending appointment for an overnight sleep study, and an additional appointment with an orthopedist for evaluation of back pain and numbness in her legs ... . Many of her disease processes will not improve over time, but with proper medication and treatment they can be controlled." Tr. 271, 310.

Records from NMHC, dated February 5, 2007, state that Plaintiff was a "no show for paps and labs." Tr. 339-40.

Records from NMHC, dated March 14, 2007, reflect that Plaintiff presented to "go over labs, discuss pain pill/muscle relaxer"; that Plaintiff said that she was "having a lot of pain" and "unable to sleep"; that Plaintiff weighed 288 pounds; that Plaintiff's blood pressure was 141/78; that Plaintiff's chest motion was good; and that Plaintiff exhibited no edema in her extremities. Tr. 342, 408.

A March 15, 2007 laboratory report from Quest Diagnostics, from specimens collected on March 14, 2007, states that Plaintiff's microalbumin/creatinine levels were out of range. Tr. 426.

Records from NMHC, dated March 28, 2007, reflect that Plaintiff rescheduled an appointment she had for that date due to a lack of transportation. Tr. 409.

Records from NMHC, dated April 9, 2007, reflect that Plaintiff's blood sugar readings ranged from 111-180, when Plaintiff is not fasting; that Plaintiff said that her "allergies [were] bothering her"; that Plaintiff said that corns on feet hurt; that she weighed 283 pounds; that her blood pressure was 130/80; that her heart rate was 88 BPM, with regular rhythm and no murmurs; that Plaintiff's lungs were clear; that Plaintiff's chest motion was good; that Plaintiff's "feet [were] tingling and painful";

that she had "callous[es] on each foot"; that Plaintiff's diagnoses included "Type II Diabetes mellitus, allergic rhinitis, and "diabetic neurage"; and that it was recommended that Plaintiff schedule an appointment with a podiatrist regarding her diabetes and the corns on her feet, and that she take she take a decongestant, and that she wear shoes at home. Tr. 410.

Records from NMHC, dated April 23, 2007, reflect that Plaintiff rescheduled an appointment for that date. Tr. 411.

Records from NMHC, dated April 25, 2007, reflect that Plaintiff reported that Lyrica caused her to be too sleepy and that she took this medication for "only 3 days"; that Plaintiff complained of left shoulder pain with lifting and that her right leg went numb and shook "in certain positions – esp[ecially] sitting in hard chairs"; that Plaintiff weighed 290 pounds; that her blood pressure was 132/78; that her heart rate was 80 BPM; that she presented alert and with no distress; that her lungs were clear; that her chest motion was good; that her extremities exhibited no edema; and that Plaintiff had a "thick callous" on her right foot. It was recommended on this date that Plaintiff continue her medications, stop smoking, apply Vaseline to her feet at bedtime, and conduct daily foot exams and that Plaintiff return in three months. Tr. 412.

A June 21, 2007 laboratory report from Quest Diagnostics, from specimens collected on June 20, 2007, states that Plaintiff's triglycerides, total cholesterol, LDL-cholesterol, glucose level, and Hemoglobin were elevated; and that Plaintiff's sodium, chloride, albumin, and AST levels were below range. Tr. 427-28.

A letter from Edna DeCastro, M.D., dated June 21, 2007, states that Dr. DeCastro interviewed and examined Plaintiff "for her disability determination." Dr. DeCastro stated in this letter that Plaintiff presented for examination "because of allegations of fibromyalgia, lower back and arm

pain, carpal tunnel, torn rotator cuff in both shoulders, and diabetes." Dr. DeCastro's assessment was as follows:

> 1. Low back pain secondary to arthritis: at the present time there is no evidence of herniated disc; 2. Multiple aches and pains: I do not believe that the patient has fibromyalgia. Most of her pain far exceeds my physical examination; 3. Marked deconditioning contributed by; 4. Major Depression/Anxiety and Morbid Obesity; 5. Irritable bowel syndrome; 6. Memory disturbance: At the present time there does not appear to be any metabolic or physiologic etiology other than possible uncontrolled diabetes; 7. Diabetes - uncontrolled. Labs revealed on 2/10/06 Hemoglobic A1C 9.2%. She has sequella of bilateral peripheral neuropathy; 8. Hypertension: Patient is on medications; 9. Hyperlipidemia: Review of labs reveal on 2/10/06 Total cholesterol 234, triglycerides 166, HDL 52, LDL 147; 10. Tobacco/COPD - patient on multiple inhalers with control unfortunately the patient continues to smoke; 11. Morbidly obesity with body mass index 48; [and] 12. Glaucoma.

Tr. 355.

Also, on June 21, 2007, Dr. DeCastro completed a Medical Source Statement of Ability To Do Work-Related Activities (Physical), in which Dr. DeCastro reported that Plaintiff can lift and carry up to ten pounds continuously, eleven to twenty pounds frequently, twenty-one to fifty pounds occasionally, and never lift fifty-one to one-hundred pounds; that, at one time, Plaintiff can sit for four hours, stand for thirty minutes, and walk for thirty minutes; that in an eight-hour work-day Plaintiff can sit for eight hours, stand for two hours, and walk for three hours; that Plaintiff ambulates without a cane; that, with either hand, Plaintiff can frequently reach, handle, finger, feel and push/pull; that, with each foot, Plaintiff can occasionally operate controls; that Plaintiff can occasionally climb stairs and ramps; that Plaintiff can never climb ladders, balance, stoop, kneel, crouch, or crawl; that Plaintiff had no hearing or vision impairments; that Plaintiff occasionally can have exposure to moving mechanical parts, humidity and wetness, dust, odors, fumes and pulmonary irritants, extreme cold and heat, and vibrations; that Plaintiff can occasionally operate a motor vehicle; that Plaintiff can never

be exposed to unprotected heights; that Plaintiff can have moderate exposure to noise; and that Plaintiff can shop, travel with a companion, ambulate without an assistive device, walk a block at a reasonable pace on rough or uneven surfaces, use public transportation, climb a few steps, prepare simple meals, take care of her personal hygiene, and sort, handle, and use paper/files. Tr. 356-64.

Records from NMHC, dated July 18, 2007, reflect that Plaintiff cancelled an appointment for that date. Tr. 414.

Records from NMHC, dated July 26, 2007, reflect that Plaintiff presented to "discuss smoking cessation"; that Plaintiff "smoke[d] 2-3 packs per day – 'chain smoker'"; that Plaintiff said she was unable "to work/shop/socialize due to back and hip pain"; that Plaintiff weighed 292 pounds; that Plaintiff's blood pressure was 128/80; that Plaintiff is short of breath, with exertion; that Plaintiff said she "feels dizzy at times"; that Plaintiff had decreased auscultation of the lungs; that Plaintiff's chest motion was good; that Plaintiff had no edema of the extremities; that Plaintiff's diagnoses included tobacco abuse, type II diabetes, glaucoma, HTN and RF; that it was recommended that Plaintiff get a "blood glucose monitor and supplies for QD testing"; that Plaintiff was to use "Chantix if MCD will cover – not available [with] MCD – will explore alternatives"; and that an appointment with Dr. Whitlock would be scheduled to evaluate Plaintiff's pain. Tr. 415.

Records from NMHC, dated August 2, 2007, signed by Dr. Whitlock, reflect that Plaintiff said she "unable to work due to back & hip pain"; that Plaintiff weighed 289 pounds; that Plaintiff's blood pressure was 141/80; that Plaintiff's heart rate was 77 BPM; that Plaintiff's neck examination showed decreased ROM, pain, numbness, and tingling; that Plaintiff's lungs exhibited bilateral wheezing and airway noise; that Plaintiff's chest motion was good; that Plaintiff's extremities exhibited a "[decreased] ROM of limb strength +4/5"; that Plaintiff was diagnosed with NIDDM, peripheral

33

vascular disease, peripheral neuropathy, and degenerative disk disease; and that an MRI was recommended. Tr. 416.

An x-ray report from Northeast Regional Medical Center, dated August 14, 2007, states that x-rays of Plaintiff's cervical spine showed that "the bony elements [were] in adequate alignment"; that there were no low or high dense lesions; that no fractures were identified; that no arthritic changes were noted; that the trachea was not displaced; that no unusual soft tissue calcifications were noted; and that the "transverse processes of C7 [were] quite long that may cause thoracic outlet type symptoms." The impression of radiologist Paul M. Williams, D.O., from the x-rays was, "[n]ormal cervical spine. Long transverse processes of C7, may cause thoracic outlet type symptoms." Tr. 370.

Records from NMHC, dated August 20, 2007, reflect that Plaintiff rescheduled her appointment for that date. Tr. 417.

Records from NMHC, dated August 23, 2007, reflect that Plaintiff presented to review her x-rays; that Plaintiff complained of left shoulder pain and pain in her head and ears; that Plaintiff weighed 286 pounds; that Plaintiff's blood pressure was 160/87; and that Plaintiff's heart rate was 75 BPM; and that Plaintiff's diagnosis included somatic dysfunction, back pain, NIDDM, HTN, and glaucoma. Tr. 418.

On August 27, 2007, Dr. Whitlock completed a "medical statement regarding physical abilities and limitations for Social Security disability," at the request of Plaintiffs attorney. In this medical statement Dr. Whitlock reported that Plaintiff's diagnoses included NIDDM, HTN, glaucoma, cataracts, degenerative joint disease, peripheral neuropathy, depression, and Type II diabetes. In regard to Plaintiff's diabetes, Dr. Whitlock stated that Plaintiff had:

Neurophathy demonstrated by significant and persistent disorganization of motor

function in two extremities resulting in sustained disturbance of gross and dexterous movements, or gait and station.

Tr. 368.

Dr. Whitlock further reported that Plaintiff had retinitis proliferans; cataracts; impaired arterial blood flow; coronary artery disease; skin breakdown; foot ulcers; nephropathy; and diabetic gut. Tr. 368. In the August 28, 2007 medical statement, Dr. Whitlock further opined that, in his medical opinion, Plaintiff has the following limitations and abilities: Plaintiff can work two hours per day; she can stand fifteen minutes at one time; she can stand a total of sixty minutes in a workday; she can sit fifteen minutes at one time; she can sit two hours in a work day; she can lift ten pounds on an occasional basis; frequently, she can lift five pounds; she can occasionally bend and balance, raise her right and left arms over shoulder level, operate a motor vehicle, and tolerate heat, cold, and noise exposure; she can never stoop, work around dangerous equipment or tolerate dust, smoke or fumes exposure; she has limited close vision; and occasionally needs to elevate legs during an eight-hour workday. Dr. Whitlock further reported that in his opinion, Plaintiff's pain is between "moderate" and "severe" and that "due to her diabetes, arthritis, and peripheral neuropathy, [Plaintiff] is at risk for injury with many work types, especially the one she was trained for." Tr. 367-69.

Records from NMHC, dated September 13 and 27, 2007, reflect that Plaintiff rescheduled appointments for those dates. Tr. 419, 420

Records from NMHC, dated October 4, 2007, reflect that Plaintiff reported that she fell the prior month, hitting her head and right arm; that Plaintiff weighed 290 pounds; that Plaintiff's blood pressure was 147/83; that Plaintiff's heart rate was 90 BPM; that Plaintiff eyes, ENT, and sinuses were all unremarkable; that Plaintiff had no abdominal masses or tenderness; that Plaintiff denied

diarrhea or constipation; that Plaintiff's diagnoses included "Syacopal episodes – progressive," "Loss of bladder control with last episode" and "[h]eart rate change with episodes," NIDDM, and HTN; and that it was recommended that Plaintiff continue with her present medications and that she see a cardiologist. Tr. 421.

Records from NMHC, dated October 22, 2007, reflect that Plaintiff weighed 289 pounds; that Plaintiff's blood pressure was 158/80; that Plaintiff's heart rate was 80 BPM; that Plaintiff was diagnosed with resolving URI, dyspnea, wheezing, HTN, glaucoma, peripheral vascular disease, peripheral neuropathy, left shoulder impairment, right lateral epicondylitis, and low back pain. Tr. 422.

Records from Northeast Regional Medical Center, dated November 6, 2007, reflect that Plaintiff's admitting diagnosis was "resolving URI dyspnea wheezing." Lewis H. Westmoreland, D.O., reported on this date that Plaintiff has a history of dyspnea and wheezing; that x-rays showed "[m]ild endplate osteophytic change of the spine and old granulomatous disease"; that x-rays showed that the "cardiac size and pulmonary vasculature display[ed] no abnormalities"; and that there was "no evidence of infiltrate, effusion, or pneumothorax." Tr. 404. Records of this date also state that Plaintiff had a respiratory exam and the pulmonary function diagnosis was "minimal obstructive airways disease – peripheral airway." Tr. 405-06.

Records from NMHC, dated November 15, 2007, reflect that Plaintiff rescheduled an appointment for that date. Tr. 423.

### III.
### TESTIMONY BEFORE THE ALJ

**A.**      **Plaintiff's Testimony:**

Plaintiff testified that, at the time of the hearing, she was fifty-one years old; that she is right-handed; that she lived with her daughter, who, at the time, was twenty-one years old, and with her grandson, who, at the time, was fifteen months; that her daughter "is slightly mentally challenged" and "draws SSI." Tr. 477, 496.

Plaintiff further testified that she completed the eleventh grade; that she never obtained her GED; that Plaintiff went "to school for CNA"; that Plaintiff was a CNA at a nursing home for six years; that she stopped working as a CNA because her "doctor took [her] off of work in February . . . of 2005"; that prior to working at the nursing home she worked as a NA at a mental and drug rehabilitation facility, where she mopped, swept, did the laundry, and helped dress, wash and shower patients; that she also worked at a shoe factory; that she stopped working at the shoe factory because she had difficulty using her arms; that she also worked at a diner as a cook; that working as a cook was not good for her blood sugar because it altered her eating schedule; that her previous jobs also included working as a cashier in Las Vegas and that she would "like to have a job like that"; that she left her job as a cashier in Las Vegas to come to St. Louis with her husband; and that when she returned to Las Vegas the cashier job was eliminated. Tr. 459, 478-85.

Plaintiff testified that when she worked at Crosspointe Residential Care, she did laundry, changed sheets on beds, swept rooms, and gave residents showers; that Plaintiff sometimes engaged in some personal lifting; that now you have to be certified to work there and Plaintiff is not certified; that Plaintiff also worked in the kitchen at Crosspointe; and that working in the kitchen required Plaintiff to lift heavy pots and pans. Tr. 458.

Plaintiff testified that she had been a patient of Dr. Petry's for "a long time"; that Dr. Petry moved to Colorado and that he is no longer her physician; that Dr. Petry was at the Northeast

Missouri Health Council; and that a new doctor assumed Dr. Petry's position at the Northeast Missouri Health Council. Tr. 486.

Plaintiff testified that she coughs continuously; that she smokes; that "everybody" tells her that she should not smoke; that she has taken a product that "starts with a V" and is advertised on TV to provide relief from coughing; and that Plaintiff only takes this product when she feels like she needs it. Tr. 491-92.

Plaintiff testified that at one point she wore glasses and that the glasses enabled her to see to do paperwork. Tr. 508. Plaintiff testified that her treating healthcare professionals told her she could buy over-the-counter glasses, which she had not done; and that with over-the-counter glasses numbers are blurry. Tr. 494-95.

Plaintiff testified that she wakes up several times throughout the night; that, when she wakes up in the middle of the night, she is up for "maybe an hour or so or two"; that when she requested medication to help her sleep, the doctor said that she "needed to wait" because she may have sleep apnea; that the doctor has told Plaintiff that she should be tested for sleep apnea; that she has not been tested for sleep apnea; that she was going to be tested; that Plaintiff has a phobia about being tested; and that Plaintiff does not like to be away from home. Tr. 493.

Plaintiff testified that, during the day, after taking care of her personal needs, she makes herself coffee; that she does not read because she "can't see very good"; that she does not go anywhere because she cannot drive; that she watches television sometimes; that she sometimes lays down because her back hurts; and that her nephew drove her to the hearing. Tr. 478, 493.

Plaintiff further testified that she showers infrequently because "it's a chore to get in there to do it"; that she is able to use the bathroom independently; that it is hard to bend over long enough

38

to put on pants; that she does "very little" in terms of household chores; that her daughter "helps a little" with the chores; and that Plaintiff "need[s] extra help" to take care of her house. Tr. 495-96. Plaintiff testified that she experiences numbness in her hands and arms; that she experiences numbness in her fingers; that she is not strong enough to turn a hand-held can-opener; that she becomes frustrated at not being able to open a can; and that she can "sometimes" pick a coin or a similar item off of a table. Tr. 507.

Plaintiff stated that Dr. Petry told her she should not carry her grandson, who is "like 22 or 23 pounds" and that she should not lift over 10 pounds; that she cannot walk for very long "because [her] feet hurt like they're on fire" and "like pins and needles [are] going through [her] feet"; that this condition "started getting really bad the last couple of years that [she] worked at the nursing home"; and that Plaintiff has difficulty standing because of her feet and her back. Tr. 497-98. Plaintiff also said that Dr. Petry suggested that he wanted Plaintiff to use a walker and that Plaintiff did not want to use a walker because she was "embarrassed." Tr. 500.

Plaintiff testified that she went to a doctor to have her knees checked; that the doctor "sa[id] to try to exercise [ ], and if that didn't work [Plaintiff would] have to have knee shots"; that when the doctor told Plaintiff that knee shots might be necessary, Plaintiff "said I'm not going back"; that Plaintiff has not had  physical therapy; that Plaintiff does not wear any special shoes; that "Dr. Petry told [Plaintiff] to go out and spend some good money on a good pair of shoes, but he didn't say what kind"; that Dr. Petry did not send Plaintiff to an orthotist; that Plaintiff has calluses on the bottoms and tops of her feet; that she has never had her calluses treated; and that Plaintiff has not seen a podiatrist since she quit work. Tr. 502-503.

Plaintiff testified that she had to take  a test to be a CNA; that Plaintiff did not take a standard

written test because she was unable to take it; and that Plaintiff took the test orally because of "stress anxiety." Tr. 504. Plaintiff also testified that her memory is "not very good" and that her son told her she "needed to take memory pills because [she's] losing [her] mind." Tr. 508

Plaintiff said she had a blackout and fell down a year or two prior to the hearing; that she still experiences the symptoms she had before the blackout; that she can "feel [the symptoms] coming on"; that Plaintiff experienced a symptom the morning of the hearing; that she does not experience symptoms every day; that she has problems controlling her bladder; that Plaintiff cannot take the pill suggested by her doctor for her bladder problem because it is contraindicated by her glaucoma; and that Plaintiff has irritable bowel syndrome, which can be unpredictable. Tr. 508-11. Plaintiff further testified that, because of her dizzy spells, Dr. Whitlock "told [her] not to go anywhere by myself" and that if she did, she should "carry a cane or a walker." Tr. 455.

Plaintiff further testified that she has problems with her lower back; that, according to the MRI doctor, she has a herniated disk, a bone spur, and degenerative disk disorder; that she has pain in her lower back; that Plaintiff is not able to sit very long without squirming; that people tell Plaintiff she does not exercise enough; that she tells people she does not take her pain medication because she does not like to take it; and that the pain from Plaintiff's back radiates into her legs; that she has gained "a lot" of weight since quitting work; and that she "weighed 190 pounds" when she was working and that now she weighs "200 or 300 or more." Tr. 511-13.

Plaintiff testified that she has headaches "quite often"; that she "had one for three days"; that the headaches were "piercing"; that "the light bothers [her] eyes to a point"; that she has not been treated for her headaches; that she thinks she has migraines; and that she does not throw up when she has a headache. Tr. 513-514.

Plaintiff testified that her Effexor dosage was increased partly because she was turning into "a nasty person"; that Plaintiff "almost got fired from the nursing home"; that Dr. Petry increased Plaintiff's Effexor "because he said [Plaintiff] was having anxiety attacks at work because all the stress they were putting [her] under"; and that "[i]t wasn't the old people that [got] on [Plaintiff's] nerves. It was the people that [Plaintiff] worked with that [got] onto her nerves." Tr. 516.

**B.      Testimony of the Vocational Expert:**

Vocational Expert Barbara Myers (the "VE") testified that Plaintiff's past work as a cashier, change person, is classified as a medium and unskilled job and that Plaintiff's past work as a nurse aid is classified as a medium and semiskilled job. Tr. 459.

The ALJ posed a hypothetical to the VE in which the VE was asked if Plaintiff had the following restriction, if there is work which she can perform: jobs simple and/or repetitive in nature; jobs not requiring close interaction with the general public and which do not involve frequent or significant changes in the work setting or work process; jobs allowing the person to lift and carry up to 50 pounds on occasion and 20 pounds frequently; jobs where a person would be able to sit for at least four and up to eight hours in an eight-hour workday and/or where person could stand and/or walk about a total of five hours in an eight-hour workday; jobs where the person would be limited to frequent but not continuous use of the upper extremities for reaching, handling, fingering, feeling, pushing and pulling; jobs that would only occasionally require climbing ramps and stairs; jobs that do not require climbing ladders, ropes, or scaffolds; jobs where persons should generally avoid bending, crawling, crouching, kneeling, stooping, and balancing; jobs where one may avoid working at unprotected dangerous heights and around unprotected dangerous machinery; jobs where person would only occasionally operate a motor vehicle; jobs where person would only occasionally work

in humidity and wetness, noxious environments, dusts, odors, etc. and could only occasionally be around extreme cold and heat and full body vibration; jobs were there is only moderate noise, like in an office; and could only occasionally operate foot controls bilaterally. Tr. 459-61. Upon the ALJ's being asked to define "no close interaction with the public," the ALJ responded, "[a]s long as it's just taking money and making change basically I think that would be okay except not having to engage much more than that." Tr. 461. The ALJ clarified further to state he envisioned "[b]asically a sales job or somebody who's in a return desk of a department store." Tr. 461. The VE testified that "[a]ccording to that hypothetical, the change person would be available" to a person described in this first hypothetical. Tr. 461.

The VE also testified that if there were not past relevant employment available to Plaintiff, such as the change person position, there were other jobs available at the medium or light or sedentary exertional level. In particular, the VE testified that, "[a]t the light level, a folding machine operator. It's light and unskilled, approximately 1,000 in the state, 70,000 nationally. And office helper is light and unskilled, approximately 1,000 in the state, 35,000 nationally. And a photocopy machine operator, 1,000 in the state, 35,000 nationally, light and unskilled." At the sedentary level, the VE testified that Plaintiff could be "a document preparer, sedentary and unskilled" and that there are approximately 1,000 of those positions in the State and 70,000 nationally. The VE also testified that Plaintiff could also be a hand packager and that there are approximately 1,000 of those in the State and 50,000 nationally. Tr. 462.

The VE further testified that modifying the first hypothetical, such that "if the ability to complete a normal workday and work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest

periods, if there were frequent interruptions that required redirection to keep on task," the jobs available in the first hypothetical "would not be available." Tr. 466.

The VE testified there are no positions available to a person who, hypothetically, could work only two hours in an eight-hour day and that there are no positions available for a person who can work eight hours each day, but can stand only sixty minutes in an eight-hour workday, stand, at any one time, for a maximum of 15 minutes, and sit a maximum of fifteen minutes, before having to change positions. Tr. 462. The VE testified that if a person can only work two hours total out of an eight-hour workday, that precludes all competitive employment, regardless of other restriction. Tr. 462.

## IV.
## DECISION OF THE ALJ

Pursuant to the sequential analysis applicable to determining whether a claimant is disabled under the Act, the ALJ found that Plaintiff had not engaged in substantial gainful activity since her alleged onset date of August 1, 2004. The ALJ further considered that Plaintiff alleged that she is disabled due to a herniated disc, diabetes with dizzy spells and peripheral neuropathy numbness affecting her hands, feet, and right leg, feet calluses, asthma, chronic obstructive pulmonary disease ("COPD"), hypertension, hyperlipidemia, sleep apnea, glaucoma with laser surgeries for cataracts, irritable bowel syndrome ("IBS"), bladder incontinence, piercing headaches, stress-related anxiety attacks, and memory loss.

The ALJ proceeded to consider Plaintiff's testimony, a statement from a witness, and Plaintiff's medical records, and concluded that Plaintiff has the residual functional capacity ("RFC") to perform her past relevant work as a cashier, notwithstanding her impairments and allegations. As

such, the ALJ found that Plaintiff is not disabled. Alternatively, the ALJ considered, if Plaintiff were not able to perform her past relevant work, that there are light, unskilled jobs in the economy which Plaintiff can perform.

## V.
## LEGAL STANDARDS

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 416(i)(1)(A); 42 U.S.C. § 423(d)(1)(A). Under the Social Security Act, the Commissioner has established a five-step process for determining whether a person is disabled. 20 C.F.R. §§ 416.920, 404.1529. "'If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled.'" Goff v. Barnhart, 421 F.3d 785, 790 (8th Cir. 2005) (quoting Eichelberger v. Barnhart, 390 F.3d 584, 590-91 (8th Cir. 2004)).

In this sequential analysis, the claimant first cannot be engaged in "substantial gainful activity" to qualify for disability benefits. 20 C.F.R. § § 416.920(b), 404.1520(b). "Substantial gainful activity means the performance of substantial services with reasonable regularity either in [a] competitive [environment] or self-employment." Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989) (internal citations omitted). For example, "[t]he ability to do light housework with assistance, attend church, or visit with friends on the phone does not qualify as the ability to do substantial gainful activity." Id.

Second, the claimant must have a severe impairment. 20 C.F.R. §§ 416.920(c), 404.1520(c). The Social Security Act defines "severe impairment" as "any impairment or combination of

impairments which significantly limits [claimant's] physical or mental ability to do basic work activities … ." Id. "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on [his or] her ability to work." Page v. Astrue, 484 F.3d 1040, 1043 (8th Cir. 2007) (quoting Caviness v. Massanari, 250 F.3d 603, 605 (8th Cir. 2001) (citing Nguyen v. Chater, 75 F.3d 429, 430-31 (8th Cir. 1996)).

Third, the ALJ must determine whether the claimant has an impairment which meets or equals one of the impairments listed in the Regulations. 20 C.F.R. § § 416.920(d), 404.1520(d); Part 404, Subpart P, Appendix 1. If the claimant has one of, or the medical equivalent of, these impairments, then the claimant is per se disabled without consideration of the claimant's age, education, or work history. Id.

Fourth, the impairment must prevent claimant from doing past relevant work. 20 C.F.R. § § 416.920(e), 404.1520(e). The burden rests with the claimant at this fourth step to establish his or her RFC. Eichelberger, 390 F.3d at 590-91; Masterson v. Barnhart, 363 F.3d 731, 737 (8th Cir. 2004); Young v. Afpel, 221 F.3d 1065, 1069 n.5 (8th Cir. 2000). The ALJ will review a claimant's residual functional capacity and the physical and mental demands of the work the claimant has done in the past. 20 C.F.R. § 404.1520(f).

Fifth, the severe impairment must prevent claimant from doing any other work. 20 C.F.R. § §416.920(g), 404.1520(g). At this fifth step of the sequential analysis, the Commissioner has the burden of production to produce evidence of other jobs in the national economy that can be performed by a person with the claimant's RFC. Young, 221 F.3d at 1069 n.5. If the claimant meets these standards, the ALJ will find the claimant to be disabled. "The ultimate burden of persuasion

to prove disability, however, remains with the claimant." Id. See also Harris v. Barnhart, 356 F.3d 926, 931 n.2 (8th Cir. 2004) (citing 68 Fed. Reg. 51153, 51155 (Aug. 26, 2003)); Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004) ("The burden of persuasion to prove disability and to demonstrate RFC remains on the claimant, even when the burden of production shifts to the Commissioner at step five."); Charles v. Barnhart, 375 F.3d 777, 782 n.5 (8th Cir. 2004) ("[T]he burden of production shifts to the Commissioner at step five to submit evidence of other work in the national economy that [the claimant] could perform, given her RFC").

Even if a court finds that there is a preponderance of the evidence against the ALJ's decision, that decision must be affirmed if it is supported by substantial evidence. Clark v. Heckler, 733 F.2d 65, 68 (8th Cir. 1984). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002). See also Cox v. Astrue, 495 F.3d 614, 617 (8th Cir. 2007). In Bland v. Bowen, 861 F.2d 533 (8th Cir. 1988), the Eighth Circuit Court of Appeals held:

> [t]he concept of substantial evidence is something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the Secretary may decide to grant or deny benefits without being subject to reversal on appeal.

Id. at 535. See also Lacroix v. Barnhart, 465 F.3d 881, 885 (8th Cir. 2006) ("[W]e may not reverse merely because substantial evidence exists for the opposite decision.") (quoting Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996)); Hartfield v. Barnhart, 384 F.3d 986, 988 (8th Cir. 2004) ("[R]eview of the Commissioner's final decision is deferential.").

It is not the job of the district court to re-weigh the evidence or review the factual record de novo. Cox, 495 F.3d at 617; Guillams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005); McClees v.

Shalala, 2 F.3d 301, 302 (8th Cir. 1994); Murphy v. Sullivan, 953 F.2d 383, 384 (8th Cir. 1992).

Instead, the district court must simply determine whether the quantity and quality of evidence is

enough so that a reasonable mind might find it adequate to support the ALJ's conclusion. Davis v.

Apfel, 239 F.3d 962, 966 (8th Cir. 2001) (citing McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir.

2000)). Weighing the evidence is a function of the ALJ, who is the fact-finder. Benskin v. Bowen,

830 F.2d 878, 882 (8th Cir. 1987). See also Onstead v. Sullivan, 962 F.2d 803, 804 (8th Cir. 1992)

(holding that an ALJ's decision is conclusive upon a reviewing court if it is supported by "substantial

evidence"). Thus, an administrative decision which is supported by substantial evidence is not subject

to reversal merely because substantial evidence may also support an opposite conclusion or because

the reviewing court would have decided differently. Krogmeier, 294 F.3d at 1022 (internal citations

omitted). See also Eichelberger, 390 F.3d at 589; Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir.

2000) (quoting Terrell v. Apfel, 147 F.3d 659, 661 (8th Cir. 1998)); Hutsell v. Massanari, 259 F.3d

707, 711 (8th Cir. 2001) (internal citations omitted).

To determine whether the Commissioner's final decision is supported by substantial evidence,

the court is required to review the administrative record as a whole and to consider:

(1) The findings of credibility made by the ALJ;

(2) The education, background, work history, and age of the claimant;

(3) The medical evidence given by the claimant's treating physicians;

(4) The subjective complaints of pain and description of the claimant's physical activity and impairment;

(5) The corroboration by third parties of the claimant's physical impairment;

(6) The testimony of vocational experts based upon proper hypothetical

questions which fairly set forth the claimant's physical impairment; and

(7) The testimony of consulting physicians.

Brand v. Sec'y of Dept. of Health, Educ. & Welfare, 623 F.2d 523, 527 (8th Cir. 1980); Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989).

"While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced." Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). When evaluating evidence of pain, the ALJ must consider:

(1) the claimant's daily activities;

(2) the subjective evidence of the duration, frequency, and intensity of the claimant's pain;

(3) any precipitating or aggravating factors;

(4) the dosage, effectiveness, and side effects of any medication; and

(5) the claimant's functional restrictions.

Baker v. Sec'y of Health & Human Servs., 955 F.2d. 552, 555 (8th Cir. 1992); Polaski, 739 F.2d at 1322. The absence of objective medical evidence is just one factor to be considered in evaluating the plaintiff's credibility. Id. The ALJ must also consider the plaintiff's prior work record, observations by third parties and treating and examining doctors, as well as the plaintiff's appearance and demeanor at the hearing. Id.; Cruse, 867 F.2d at 1186.

The ALJ must make express credibility determinations and set forth the inconsistencies in the record which cause him to reject the plaintiff's complaints. Guillams, 393 F.3d at 801; Masterson v.

Barnhart, 363 F.3d 731, 738 (8th Cir. 2004); Lewis v. Barnhart, 353 F.3d 642, 647 (8th Cir. 2003); Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995). It is not enough that the record contains inconsistencies; the ALJ must specifically demonstrate that he considered all of the evidence. Robinson, 956 F.2d at 841; Butler v. Sec'y of Health & Human Servs., 850 F.2d 425, 429 (8th Cir. 1988). The ALJ, however, "need not explicitly discuss each Polaski factor." Strongson v. Barnhart, 361 F.3d 1066, 1072 (8th Cir. 2004). The ALJ need only acknowledge and consider those factors. Id. Although credibility determinations are primarily for the ALJ and not the court, the ALJ's credibility assessment must be based on substantial evidence. Rautio v. Bowen, 862 F.2d 176, 179 (8th Cir. 1988); Millbrook v. Heckler, 780 F.2d 1371, 1374 (8th Cir. 1985).

Residual functional capacity is defined as what the claimant can do despite his or her limitations, 20 C.F.R. § 404.1545(a), and includes an assessment of physical abilities and mental impairments. 20 C.F.R. § 404.1545(b)-(e). The Commissioner must show that a claimant who cannot perform his or her past relevant work can perform other work which exists in the national economy. Karlix v. Barnhart, 457 F.3d 742, 746 (8th Cir. 2006); Nevland, 204 F.3d at 857 (citing McCoy v. Schweiker, 683 F.2d 1138, 1146-47 (8th Cir. 1982) (en banc)). The Commissioner must first prove that the claimant retains the residual functional capacity to perform other kinds of work. Goff, 421 F.3d at 790; Nevland, 204 F.3d at 857. The Commissioner has to prove this by substantial evidence. Warner v. Heckler, 722 F.2d 428, 431(8th Cir. 1983). Second, once the plaintiff's capabilities are established, the Commissioner has the burden of demonstrating that there are jobs available in the national economy that can realistically be performed by someone with the plaintiff's qualifications and capabilities. Goff, 421 F.3d at 790; Nevland, 204 F.3d at 857.

To satisfy the Commissioner's burden, the testimony of a vocational expert may be used. An

ALJ posing a hypothetical to a vocational expert is not required to include all of a plaintiff's limitations, but only those which he finds credible. Goff, 421 F.3d at 794 ("[T]he ALJ properly included only those limitations supported by the record as a whole in the hypothetical."); Rautio, 862 F.2d at 180. Use of the Medical-Vocational Guidelines is appropriate if the ALJ discredits the plaintiff's subjective complaints of pain for legally sufficient reasons. Baker v. Barnhart, 457 F.3d 882, 894-95 (8th Cir. 2006); Carlock v. Sullivan, 902 F.2d 1341, 1343 (8th Cir. 1990); Hutsell, 892 F.2d at 750.

## VI.
## DISCUSSION

The issue before the court is whether substantial evidence supports the Commissioner's final determination that Plaintiff was not disabled. Onstead, 962 F.2d at 804. Thus, even if there is substantial evidence that would support a decision opposite to that of the Commissioner, the court must affirm his decision as long as there is substantial evidence in favor of the Commissioner's position. Cox, 495 F.3d at 617; Krogmeier, 294 F.3d at 1022.

Plaintiff argues that the ALJ's decision is not supported by substantial evidence because the ALJ failed to give proper weight to the opinions of Dr. Henry Petry and Dr. Michael Whitlock, who were Plaintiff's treating physicians, because the ALJ "improperly equated the level of expertise of two consultive examiners [Dr. Hayden and Dr. Tichenor] who have distinctly different qualifications," because the ALJ disregarded the opinion of Dr. Hayden, a psychiatrist hired by the State to evaluate Plaintiff, and because the ALJ gave improper weight to Dr. Tichenor, a psychologist, who was hired by Disability Determinations to perform a consultive examination of Plaintiff. For the reasons discussed below, the court finds that Plaintiff's arguments are without merit and that the decision of

the ALJ is supported by substantial evidence.

"It is the ALJ's function to resolve conflicts among the various treating and examining physicians." Estes v. Barnhart, 275 F.3d 722, 725 (8th Cir. 2002) (internal quotation marks omitted). The opinions and findings of the plaintiff's treating physician are entitled to "controlling weight" if that opinion is "'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record.'" Prosch v. Apfel, 201 F.3d 1010, 1012-13 (8th Cir. 2000) (quoting 20 C.F.R. § 404.1527(d)(2) (2000)). Indeed, if they are not controverted by substantial medical or other evidence, they are binding. Cunningham v. Apfel, 222 F.3d 496, 502 (8th Cir. 2000) (citing Ghant v. Bowen, 930 F.2d 633, 639 (8th Cir.1991); Kelley v. Callahan, 133 F.3d 583, 589 (8th Cir.1998)). However, while the opinion of the treating physician should be given great weight, this is true only if the treating physician's opinion is based on sufficient medical data. Leckenby v. Astrue, 487 F.3d 626, 632 (8th Cir. 2007) (holding that a treating physician's opinion does not automatically control or obviate need to evaluate record as whole and upholding the ALJ's decision to discount the treating physician's medical-source statement where limitations were never mentioned in numerous treatment records or supported by any explanation); Chamberlain v. Shalala, 47 F.3d 1489, 1494 (8th Cir. 1995) (citing Matthews v. Bowen, 879 F.2d 422, 424 (8thCir.1989) (holding that opinions of treating doctors are not conclusive in determining disability status and must be supported by medically acceptable clinical or diagnostic data); 20 C.F.R. § 404.1527(d)(3) (providing that more weight will be given to opinion when a medical source presents relevant evidence, such as medical signs, in support of his or her opinion). See also Hacker v. Barnhart, 459 F.3d 934, 9937 (8th Cir. 2006) (holding that where a treating physician's notes are inconsistent with his or her RFC assessment, controlling weight is not given to the RFC assessment);

Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005) (holding that a treating physician's opinion is giving controlling weight "if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence").

"Although a treating physician's opinion is entitled to great weight, it does not automatically control or obviate the need to evaluate the record as a whole." Hogan v. Apfel, 239 F.3d 958, 961 (8th Cir. 2001). A treating physician's checkmarks on a form, however, are conclusory opinions which can be discounted if contradicted by other objective medical evidence. Stormo v. Barnhart, 377 F.3d 801, 805-06 (8th Cir. 2004); Hogan 239 F.3d at 961; Social Security Ruling 96-2p, (July 2, 1996). Where diagnoses of treating doctors are not supported by medically acceptable clinical and laboratory diagnostic techniques, the court need not accord such diagnoses great weight. Veal v. Bowen, 833 F.2d 693, 699 (7th Cir. 1987).

An ALJ may "discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." Prosch v. Apfel, 201 F.3d 1010, 1013 (8th Cir. 2000). See also Cox v. Barnhart, 471 F.3d 902, 907 (8th Cir. 2006) (holding that an ALJ may give a treating doctor's opinion limited weight if it is inconsistent with the record). "Medical reports of a treating physician are ordinarily entitled to greater weight than the opinion of a consulting physician." Chamberlin, 47 F.3d at 1494 (citing Matthews, 879 F.2d at 424).

A treating physician's opinion that a claimant is not able to return to work "involves an issue reserved for the Commissioner and therefore is not the type of 'medical opinion' to which the Commissioner gives controlling weight." Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005).

Moreover, a brief, conclusory letter from a treating physician stating that the applicant is disabled is not binding on the Secretary. Ward v. Heckler, 786 F.2d 844, 846 (8th Cir.1986) (per curiam) ("Even statements made by a claimant's treating physician regarding the existence of a disability have been held to be properly discounted in favor of the contrary medical opinion of a consulting physician where the treating physician's statements were conclusory in nature."). See also Hacker v. Barnhart, 459 F.3d 934, 937 (8th Cir. 2006) (holding that where a treating physician's notes are inconsistent with his or her RFC assessment, controlling weight should not be given to the RFC assessment); Chamberlain, 47 F.3d at 1494; Barrett v. Shalala, 38 F.3d 1019, 1023 (8th Cir.1994) (citing Thomas v. Sullivan, 928 F.2d 255, 259 (8th Cir.1991)); King v. Heckler, 742 F.2d 968, 973 (6th Cir. 1984) (holding that the ALJ is not bound by conclusory statements of total disability by a treating physician where the ALJ has identified good reason for not accepting the treating physician's opinion, such as its not being supported by any detailed, clinical, diagnostic evidence). On the other hand, a treating physician's observations should not necessarily be treated as conclusory where the doctor had "numerous examinations and hospital visits" with a claimant. See Turpin v. Bowen, 813 F.2d 165, 171 (8th Cir.1987).

Additionally, Social Security Regulation ("SSR") 96-2p states, in its "Explanation of Terms," that it "is an error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent with other substantial evidence in the case record." 1996 WL 374188, *2 (S.S.A. July 2, 1996). Additionally, SSR 96-2p clarifies that 20 C.F.R. § § 404.1527 and 416.927 require that the ALJ provide "good reasons in the notice of the determination or decision for the weight given to a treating source's medical opinion(s)." Id. at *5.

An ALJ's failure to consider or discuss a treating physician's opinion that a claimant is disabled is error when the record contains no contradictory medical opinion. Black v. Apfel, 143 F.3d 383, 386 (8th Cir.1998). Further, an ALJ is entitled to give less weight to the opinion of a treating doctor where the doctor's opinion was based largely on the plaintiff's subjective complaints rather than on objective medical evidence. See Kirby v. Astrue, 500 F.3d 705, 709 (8th Cir. 2007) (citing). "Generally, the longer a treating source has treated [a claimant] and the more times [a claimant has] been seen by a treating source, the more weight" is given to the source's medical opinion." Vandenboom v. Barnhart, 421 F.3d 745, 749 (8th Cir. 2005). See also Randolph v. Barnhart, 386 F.3d 835, 840 (8th Cir. 2004) (holding that a doctor's opinion stated in a checklist should not have been given controlling weight because the doctor had met with the plaintiff only three times at the time he completed the form).

Consistent with the Regulations, the ALJ stated that the opinion of a treating physician is normally entitled to great weight pursuant to 20 CFR 404.1527(d) and 416.927(d). Consistent with the Regulations, the ALJ also stated that such an opinion,

> may be disregarded or refused if it is not supported by credible medical findings on diagnostic tests and other screenings, or if it is countered by the opinion of a doctor who has greater expertise in the kind of impairment the claimant is alleging, or if the opinion is simply inconsistent with the preponderance of the other evidence in the record, medical and otherwise, including the claimant's own actions or admissions.

Tr. 18.

In regard to Dr. Petry, the ALJ considered Dr. Petry's records, including that Plaintiff was under his care from August 2003 until February 10, 2006; that he regularly monitored Plaintiff's vital signs; that Plaintiff saw Dr. Petry about once a month; that Dr. Petry gave Plaintiff several short-term work excuses; that Dr. Petry diagnosed Plaintiff with GERD, hypertension, diabetes, hyperlipidemia,

and IBS; that Dr. Petry instructed Plaintiff to maintain diet and exercise; that Dr. Petry reported in March 2004 that *Plaintiff was not complying with those instructions*[3]; that between April 2005 and February 2006 Plaintiff's allegations to Dr. Petry were mainly of back pain; that during this period Plaintiff also complained of eye pain, poor sleep, and allergies and there was *no evidence of limited range of motion or any joint swelling or edema*; and that a December 2005 MRI showed *moderate* facet osteoarthritis, some narrowing, *mild* degenerative changes at disc spaces, and *no evidence of disc herniation, spinal stenosis, nerve root impingement, or compression.* The court also notes that in August 2005 Dr. Petry reported that Plaintiff had *normal range of motion in both shoulders*, with the exception of internal rotation, and that Plaintiff had *normal range of motion in the cervical spine, both elbows, both forearms, both wrists, and in both legs for straight leg raising.* Dr. Petry also reported in August 2005 that Plaintiff's grip was strong in her right hand and moderate in her left. Significantly, Plaintiff testified that she is right handed.

The court notes that Dr. Petry referred Plaintiff to Dr. Khan for an evaluation of her foot numbness, and that Dr. Khan reported in January 2006 that Plaintiff had *normal muscle strength, tone, and* gait and in June 2006 that Plaintiff was *alert, had fluent speech, normal tone and coordination, unremarkable gait, and good strength.*

Plaintiff contends that the ALJ incorrectly stated that Dr. Petry, her treating doctor, did not suggest that she was disabled. The ALJ did state that Dr. Petry, who treated Plaintiff "for some 30 months, at least, and [ ] was aware of just about all of the claimant's chronic impairments, never

---

[3]     A claimant's failure to comply with prescribed medical treatment is inconsistent with complaints of disabling pain. <u>Brown v. Chater</u>, 87 F.3d 963, 965 (8th Cir. 1996). Also, "a claimant who fails to treat a remediable condition without good reason is barred from entitlement to benefits." <u>Tome v. Schweiker</u>, 724 F.2d 711, 713-714 (8th Cir. 1984) (citing 20 C.F.R. §§ 404.1518, 404.1530)

stated or implied that she was disabled." Tr. 19. Indeed, records from NMHC, dated February 4, 2005, reflect that it was recommended Plaintiff apply for SSI disability. Also, notes of this date state "totally disable[d]." Tr. 197. Records from NMHC, dated August 12, 2005, also state that Plaintiff "is totally disabled for gainful employment due to physical status and education (11 grade) NO GED." Tr. 240. It is not clear from NMHC records who saw Plaintiff or who made record entries. In any case, the ALJ's decision reflects that he considered all of Plaintiff's medical records, and discounted medical opinions stating that she is disabled. To the extent that the ALJ erred regarding Dr. Petry's recommendations, an ALJ's arguable deficiency in opinion-writing technique does not require a court to set aside a finding that is supported by substantial evidence. See Reynolds v. Chater, 82 F.3d 254, 258 (8th Cir. 1996). Because the court finds that the decision of the ALJ is supported by substantial evidence, any deficiency in regard to the ALJ's consideration of Dr. Petry's opinion does not require that the court set aside the ALJ's decision. Moreover, the decision of whether a claimant is disabled within the meaning of the Act is for the ALJ to decide. See Ellis, 392 F.3d at 994; Ward, 786 F.2d at 846. To the extent Plaintiff testified that Dr. Petry told her she could not lift over ten pounds, the ALJ noted that the record does not reflect that Dr. Petry imposed such a restriction. Even if Dr. Petry reported that Plaintiff is unable to work, Dr. Petry's own records are inconsistent with such a conclusion. As such, Dr. Petry's opinion is not controlling. See Leckenby, 487 F.3d at 632; Chamberlain, 47 F.3d at 1494; Barrett, 38 F.3d at 1023; King, 742 F.2d at 973.

To the extent that Plaintiff contends that the ALJ incorrectly stated that Dr. Whitlock was not a treating doctor, Plaintiff is mistaken. The ALJ merely stated that, at the time Dr. Whitlock completed an August 27, 2007 assessment, he had only seen Plaintiff, for the first time, twenty-five days earlier. The ALJ did state that Plaintiff saw Dr. Whitlock several times between August 2 and

October 22, 2007, and considered the form which Dr. Whitlock completed on August 27, 2007, which form stated that Plaintiff has the RFC for less than sedentary work. Upon discrediting Dr. Whitlock's conclusions in this regard, the ALJ noted that, as of November 2, 2007, Plaintiff had a resolving upper respiratory infection, a chest x-ray was basically negative, and pulmonary function tests showed minimal obstructive airway disease. As such, Dr. Whitlock's conclusions were inconsistent with Plaintiff's medical records, including those of Dr. Whitlock. See Cox, 471 F.3d at 907; Hacker, 459 F.3d at 937; Prosch, 201 F.3d at 1013; Veal, 833 F.2d at 699. Moreover, the ALJ stated good reasons for discrediting Dr. Whitlock's opinion. See SSR 96-2p. To the extent that the ALJ was mistaken as to the frequency with which Dr. Whitlock saw Plaintiff prior to completing the August 2007 assessment, the court finds that because the ALJ's decision is supported by substantial evidence, such a mistake does not require that the ALJ's decision be set aside. See Reynolds, 82 F.3d at 258.

Further, upon finding Plaintiff not disabled, the ALJ relied on Plaintiff's extensive medical records. In particular the ALJ considered that John W. Sparks, D.O., who examined Plaintiff on a consultive basis in April 2005, reported that Plaintiff's *complaints exceeded her physical findings* and that the only impairment which "might interfere with [Plaintiff's] ability to work" was her Type II diabetes. The ALJ also considered that after cataract surgery, Dr. Young, Plaintiff's opthamalogist, reported, in December 2002, that Plaintiff had 20/25 vision in one eye and 20/20 in the other; that Dr. Young reported in May 2007 that Plaintiff had 20/40 vision in both eyes; and that Dr. Young's records do not reflect that Plaintiff has any "chronic inability to work due to any visual impairment." In regard to doctors' records, the ALJ further considered that Dr. DeCastro, who examined Plaintiff on a consulting basis, reported that Plaintiff *did not have a herniated disc or fibromyalgia*; that

Plaintiff's *complaints exceeded the medical findings*; that Dr. Sparks had reached the same conclusion in April 2005 regarding the excessiveness of Plaintiff's complaints; that she suspected marked *deconditioning on Plaintiff's part*; that Plaintiff can stand two hours, walk three hours, and sit eight hours in an eight-hour work day; and that Plaintiff should avoid unprotected heights, not work more than occasionally around moving machinery, and not operate foot controls, climb, or work around various allergens more than occasionally. Indeed, Dr. DeCastro further reported that Plaintiff can sit four hours and stand and sit for thirty minutes at a time.

The ALJ also considered test results, including MRI's which Plaintiff underwent for back pain, one of which "failed to show anything worse than [a] *mild degree[] of musculoskeletal [] disease*," two *CT scans* of Plaintiff's head, which were *negative* and which showed *no basis for Plaintiff's dizziness*, an August 2006 x-ray which showed *mild degenerative changes in Plaintiff's left knee*, a November 2007 *chest x-ray which* was *negative*, and November 2007 pulmonary function studies which showed *minimal obstructive airway disease*. The ALJ further considered that there is *no documented evidence of headaches, or bowel or bladder accidents*.

Additionally, the ALJ considered that Plaintiff's impairments are either controlled by medication all or nearly all of the time, or match symptoms that may have occurred on only one occasion without having any real tests to establish the validity of such a diagnosis, or were diagnosed only one time and never appeared again; that Plaintiff has had no surgery or inpatient hospitalizations; that Plaintiff has not been referred for physical therapy or to any pain clinic or pain disorder specialist for any treatment; that Plaintiff does not take strong doses of any pain medication; and that any side effects Plaintiff had from medication were controlled either by changing doses or by changing the type or frequency of medication. Indeed, conditions which can be controlled by treatment are not

disabling. See Schultz v. Astrue, 479 F.3d 979, 983 (8th Cir. 2007) (holding that if an impairment can be controlled by treatment, it cannot be considered disabling); Estes v. Barnhart, 275 F.3d 722, 725 (8th Cir. 2002); Murphy, 953 F.2d 383, 384 (8th Cir. 1992); Warford v. Bowen, 875 F.2d 671, 673 (8th Cir. 1989) (holding that a medical condition that can be controlled by treatment is not disabling); James, 870 F.2d at 450. Additionally, the absence of side effects from medication is a proper factor for the ALJ to consider when determining whether a plaintiff's complaints of disabling pain are credible. See Depover v. Barnhart, 349 F.3d 563, 566 (8th Cir. 2003) ("We [] think that it was reasonable for the ALJ to consider the fact that no medical records during this time period mention [the claimant's] having side effects from any medication."); Richmond v. Shalala, 23 F.3d 1441, 1444 (8th Cir. 1994). Moreover, a lack of objective medical evidence detracts from a claimant's subjective complaints. While an ALJ may not reject a claimant's subjective complaints based solely on the lack of medical evidence to fully corroborate the complaint, Jones v. Chater, 86 F.3d 823, 826 (8th Cir. 1996), the absence of an objective medical basis to support the degree of a claimant's subjective complaints is an important factor in evaluating the claimant's complaints. See Russell v. Sullivan, 950 F.2d 542, 545 (8th Cir. 1991); Edwards v. Secretary of Health & Human Services, 809 F.2d 506, 508 (8th Cir. 1987).

In regard to Plaintiff's alleged mental impairment, the ALJ concluded the Plaintiff had no "credible, medically established mental or mood disorder that would prevent her from doing ordinary work, including the jobs identified by the vocational expert." Tr. 20. Plaintiff alleges the ALJ neglected to consider the relative specialization and qualifications of Dr. Harden and Dr. Tichenor, each of whom saw Plaintiff only once for purposes of evaluation of her alleged mental impairment. See 20 CFR §§ 404.1527(d), 416.927(d). First, the court notes that Dr. Harden is a psychiatrist,

while Dr. Tichenor is a licensed psychologist. Indeed, "[t]he Commissioner is encouraged to give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than the opinion of a source who is not a specialist." Kelley v. Callahan, 133 F.3d 583, 588 (8th Cir. 1998). See also Guilliams v. Barnhart, 393 F.3d 789, 803 (8th Cir. 2005). Both of these doctors are specialists.

Second, because neither Dr. Harden nor Dr. Tichenor had an ongoing treatment relationship with Plaintiff, neither are treating physicians. See 20 CFR § 404.1502 (If the relationship with a medical source is based "solely on your need to obtain a report of your claim for disability . . . . [W]e will consider the acceptable medical source to be a nontreating source."). As such, the opinions of Dr. Harden and Dr. Tichenor are not entitled to controlling weight.

Third, the ALJ *did* consider the opinions of both doctors. The ALJ considered Dr. Tichenor's report, including his assessment that Plaintiff's GAF was 55, which indicates only moderate difficulty with social and occupational functioning. The ALJ also considered Dr. Harden's report that Plaintiff was moderately restricted with a GAF of 50. In evaluating Dr. Tichenor's opinion that Plaintiff had Adjustment Disorder with mixed anxiety and depression and Dr. Harden's opinion that Plaintiff had ADHD, the ALJ held that "Dr. Tichenor's assessment of claimant's mental impairments and capabilities in May 2005 is as valid as Dr. Harden's similar one-time examination assessment in August 2005." Tr. 18.

Upon considering Dr. Harden's diagnosis of ADHD, the ALJ correctly noted that Plaintiff's alleged ADHD appeared in no other medical record before or after the date of his report, except among the many diagnoses listed in Nurse Schrage's January 2007 report. See Prosch, 201 F.3d at 1012. Further, Plaintiff took no medication for this diagnosis and the ALJ noted that the claimant's

basic abilities to think, understand, communicate, concentrate, get along with other people, and handle normal work stress have never been significantly impaired on any documented long-term basis. The ALJ further noted that while "[t]here are mentions here and there about depression or other mood disorders, [there is] nothing severe or persistent or incapable of being controlled by simple conservative treatment measures such as mood disorder medication." Tr. 20. Indeed, although Dr. Harden recommended that Plaintiff pursue treatment for ADHD, the record does not reflect that Plaintiff sought such treatment or that she received treatment from a psychiatrist, psychologist, or other mental health professional. In fact, Dr. Tichenor opined that Plaintiff had nothing more severe than *moderately restrictive* mood disorder which was *untreated* at the time he saw Plaintiff. Seeking limited medical treatment is inconsistent with claims of disabling pain. Nelson v. Sullivan, 946 F.2d 1314, 1317 (8th Cir. 1991); James for James v. Bowen, 870 F.2d 448, 450 (8th Cir. 1989); Rautio v. Bowen, 862 F. 2d 176, 179 (8th Cir. 1988). In any case, the ALJ gave specific reasons for discounting Dr. Harden's diagnosis of ADHD, which reasons are supported by the record as a whole.

Also, in regard to Plaintiff's alleged mental impairment, based on observation of Plaintiff at the hearings, the ALJ found that "she displayed no obvious signs of depression, anxiety, memory loss, or other mental disturbance." Tr. 20. An ALJ's observations of a claimant's appearance and demeanor during the hearing is a consideration. Johnson v. Apfel, 240 F.3d 1145, 1147-48 (8th Cir. 2001) ("The ALJ's personal observations of the claimant's demeanor during the hearing is completely proper in making credibility determinations"); Jones v. Callahan,122 F.3d 1148, 1151 (8th Cir. 1997) ("When an individual's subjective complaints of pain are not fully supported by the medical evidence in the record, the ALJ may not, based solely on his personal observations, reject the complaints as incredible.") (emphasis added).

Based on the foregoing, the court finds that the ALJ gave proper weight to the opinions of all doctors of record, including treating doctors and doctors who saw Plaintiff on a consulting and/or examining basis; that the ALJ considered all of Plaintiff's medical records; and that the ALJ's conclusion that Plaintiff's impairments, whether considered individually or in combination, do not render her disabled is supported by substantial evidence.   As such, the court finds that the decision of the ALJ should be upheld. See Krogmeier, 294 F.3d at 1022; Cox, 495 F.3d at 617; Bland, 861 F.2d 533.

## VII.
## CONCLUSION

The Court finds that the Commissioner's decision is supported by substantial evidence contained in the record as a whole and should be affirmed.

**ACCORDINGLY,**

**IT IS HEREBY ORDERED** that the relief sought by Plaintiff in her Complaint and  Brief in Support of Complaint is **DENIED**; Docs. 1, 15.

**IT IS FURTHER ORDERED** that a separate Judgement shall be entered in favor of Defendant and against Plaintiff in the instant cause of action and incorporating this Memorandum Opinion.


/s/Mary Ann L. Medler
MARY ANN L. MEDLER
UNITED STATES MAGISTRATE JUDGE


Dated this 6th day of October, 2009.